2022 IL App (4th) 200260

NO. 4-20-0260

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 21, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| RICHARD L. HOOD, | ) | No. 18CF148 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott Jones Butler, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion. Presiding Justice Knecht and Justice DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In February 2018, the State charged defendant, Richard L. Hood, with three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)) and one count of unlawful restraint (*id.* § 10-3). A jury found defendant guilty of all four counts, and the trial court later sentenced him to nine years and eight months in prison on each of the three criminal sexual assault counts and one year in prison for the unlawful restraint count, to be served consecutively.

¶ 2        Defendant appeals, arguing that the trial court erred by (1) denying defendant's requests for standby counsel, (2) admitting testimony from a sexual assault nurse examiner that did not fall within the medical diagnosis exception to the hearsay rule, (3) admitting cumulative and prejudicial evidence of the victim's demeanor after the alleged assault, and (4) entering a conviction on the unlawful restraint count because it is a lesser-included offense of criminal sexual

assault.

¶ 3          We disagree and affirm.

¶ 4                          I. BACKGROUND

¶ 5                          A. The Charges

¶ 6          In February 2018, the State charged defendant with three counts of criminal sexual assault (counts I through III) (*id.* § 11-1.20(a)(1)) and one count of unlawful restraint (count IV) (*id.* § 10-3). Counts I through III alleged that on January 30, 2018, defendant committed three separate acts of sexual penetration against B.L.M. by the use of force or threat of force: (1) penis in mouth (count I); (2) penis in vagina (count II); and (3) penis in anus (count III). Count IV alleged that, on the same day, defendant detained B.L.M., "in that he would not let her leave a house [located in] Quincy, Illinois."

¶ 7                          B. The Pretrial Proceedings

¶ 8          In April 2018, at defendant's first appearance, defendant informed the trial court that he intended to proceed *pro se*. The following month, at a status hearing, defendant refused to respond when the court asked if he still wished to represent himself or whether he wanted appointed counsel. The court determined that defendant's silence could not constitute a waiver of counsel and accordingly appointed the public defender, Todd Nelson, to represent defendant.

¶ 9          At a June 2018 hearing, defendant complained about Nelson's representation. Despite defendant's complaints, the trial court declined to vacate Nelson's appointment. Defendant then told the court he wished to represent himself. The court continued the hearing, and the next day, Nelson advised the court that he had a conflict of interest. The court reassigned the case to another attorney in Nelson's office, Chris Pratt.

¶ 10          Later in June 2018, defendant appeared with Pratt and told the trial court he was

still considering whether he wanted to proceed *pro se*. The court continued the case for one week.

¶ 11	At the next hearing, defendant told the trial court he wished to represent himself and *pro se* filed a motion for substitution of judge and a motion to dismiss the indictment. The court granted defendant's motion for substitution of judge and referred the case to the chief judge for reassignment. The court stated the new judge would address defendant's waiver of counsel.

¶ 12	In July 2018, defendant appeared with Pratt at a status hearing. The trial court asked Pratt if he was adopting defendant's *pro se* motion to dismiss the indictment. Pratt advised the court that defendant wished to represent himself. In response to the court's questions, defendant stated that he had an eighth-grade education, had no trouble reading or learning, and had participated in court proceedings before. The court stated that it was inclined to order a fitness and psychological evaluation to determine if defendant was "of his right mind" before accepting defendant's waiver of counsel. In light of the gravity of the charges, the court *sua sponte* appointed Dr. Terry Killian to conduct a fitness evaluation.

¶ 13	In August 2018, the trial court conducted a status hearing at which it addressed, among other things, defendant's (1) motion to dismiss indictment (which contained complaints about Pratt's representation), (2) fitness, and (3) waiver of counsel. The court conducted an inquiry into defendant's complaints about Pratt and found they had no merit. The court then turned to the issues of fitness and waiver of counsel and noted that Killian had submitted an evaluation concluding that (1) defendant was fit to stand trial and (2) there was no impediment to defendant's representing himself. Defendant affirmed that he still wished to waive counsel, and the court admonished defendant, pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), about the rights he would be giving up if he did so. The court's admonitions were consistent (nearly verbatim) with this court's recommended warnings about the dangers, disadvantages, and

consequences of self-representation discussed in *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82, 567 N.E.2d 642, 647-48 (1991). At the conclusion of the court's Rule 401 admonitions, as recommended in *Ward* (*id.* at 1082), the court addressed the issue of standby counsel. Specifically, the court stated the following:

> "The Court does have, I believe in its discretion, the ability to appoint standby counsel, and I am going to tell you that as I am of the belief that [doing so] puts an attorney in a difficult position as far as the role that they are actually serving[.] *** [I]t would be my intention in using my discretion not to appoint standby counsel to represent you or be present during any stage of the trial. Do you understand that?"

Defendant stated that he understood each of the *Ward* admonitions, including the admonition regarding standby counsel.

¶ 14 The trial court next inquired into defendant's education and experience. During that inquiry, defendant asserted that he had "successfully defended [himself] in several cases" and had "litigated quite a bit" while "locked up" for "24 years straight." Defendant stated that he had participated in both civil and criminal legal proceedings in the past, including three jury trials. He affirmed that he was familiar with how a trial is conducted, including jury selection and the preparation of jury instructions. Defendant stated he had questioned a witness before, was familiar with the rules of evidence, and was capable of making an opening statement and closing argument. He understood the charges against him and possible penalties. The court found defendant's waiver of counsel to be knowing and voluntary and vacated Pratt's appointment.

¶ 15 Between August and October 2018, defendant filed additional motions, including motions (1) to extend the discovery deadline, (2) to reduce bond, (3) for appointment of standby

counsel and a private investigator, and (4) for release or bond reduction.

¶ 16 In December 2018, the trial court conducted a hearing on defendant's pending motions, first addressing his motion for standby counsel. The court asked defendant why his motion for standby counsel should be granted. Defendant responded, "[A]t the time that you [accepted defendant's waiver of counsel] you made the observation that you thought it would be too complicated to appoint standby counsel. I don't think you realized the legal complexities of the issues involved." The court replied as follows:

"[A]s far as that which was stated at the time that I took your waiver for counsel, *** I was reading from admonishments to be given to a defendant wanting to proceed at a criminal trial without counsel ***. And, I believe what was said was, if the Court, in its discretion, does not appoint standby counsel, the Defendant is specifically informed that there will be no standby counsel to assist him at any stage during the trial. And, I read that, as far as the standard form admonishments—[.]

* * *

*** I don't have any transcript before me, and nobody has offered that. I will say this: Number one, it certainly would be improper for the Court to have some blanket policy in place where you wouldn't, under any circumstances appoint standby counsel. So the record is clear, I am not exerting any blanket policy with respect to your case, [defendant], or anyone other's, and considering this request that you are making, and I would likewise recognize that whether or not standby counsel is appointed or not is a discretionary matter. It is purely within the discretion of the Court to do that, and in considering that, the Court is obligated to consider three factors: Number one, the nature and gravity of the charges; second,

the expected factual and legal complexity of the proceedings; third, the abilities and experience of the Defendant. Those are factors the Court is obligated to consider that are enumerated in the case *People v. Gibson*.

Certainly, the charges that are pending against you are quite serious in nature, [defendant], with the two counts of—or three counts of criminal sexual assault and one count of unlawful restraint. The three criminal sexual assault charges all being Class 1 felonies, and as has been indicated earlier in these proceedings and in the record in this case, you do face the potential consequence if you would be found guilty of all that you're charged with of conceivably going to prison for up to 30 years for these particular charges. So, they are very serious in nature.

As far as factual and legal complexity of the proceedings as well as your own abilities, I realize that you have some—or your educational background is limited or—I asked you about that before. Nonetheless, I engaged you in dialogue as far as your ability to understand the nature of the proceedings, their purpose, I have inquired of you previously about your knowledge of procedural matters, trial procedure and things of that sort, and after having engaged you in that dialogue and heard what you have had here to say, I can appreciate that you may desire to have standby counsel appointed to represent you in this case, but in light of the information that I have glean[ed] from my conversations with you previously as well as what has been stated here today, I am going to exercise my discretion and I am going to deny your request for the appointment of standby counsel ***."

¶ 17    In January 2019, defendant was represented briefly by a private attorney, Roni

VanAusdall. When VanAusdall told the trial court she was not adopting any of defendant's *pro se* motions, defendant stated he did not want her as his attorney. The court removed defendant from the courtroom when he would not stop interrupting the proceedings.

¶ 18    VanAusdall later filed a motion to withdraw as counsel, asserting that defendant was uncooperative and insisted that she pursue frivolous motions. The court allowed VanAusdall to withdraw and gave defendant additional time to find a new attorney. At a hearing in February 2019, defendant stated that he still wanted to maintain his *pro se* status and clarified that he had just wanted VanAusdall to represent him as standby counsel.

¶ 19    In March 2019, defendant appeared in court and refused to respond to any of the court's questions about whether he wanted the court to appoint the public defender. The court found that defendant was engaging in dilatory tactics. The court also found that defendant waived his right to counsel by his conduct.

¶ 20    Defendant remained unresponsive as the trial court addressed the State's motions *in limine*. Relevant to this appeal, the State asked to admit four minutes of a video recording of B.L.M.'s interview with the police approximately 48 hours after the alleged assault. The State argued the video was relevant to show B.L.M.'s emotional state of mind. The State also sought to allow Melinda Vogel, a psychologist hired by the State to evaluate B.L.M., to testify regarding Vogel's post-traumatic stress disorder (PTSD) diagnosis of B.L.M. The court granted both motions.

¶ 21                                          C. Trial

¶ 22                                       1. *Jury Selection*

¶ 23    In April 2019, the parties convened for trial. Defendant moved for a continuance, claiming that he believed his trial was to commence the next day. Defendant told the court, "When

you asked me if I wanted an attorney, a public defender, I want to hire private counsel. *** Last resort, I would take a public defender at this point." The court construed this as a motion for a continuance to hire private counsel, and the State objected. The court denied the motion to continue.

¶ 24        Defendant then insisted he was unprepared for trial that day, was sick, had blood coming out of his rectum, and did not have street clothes. The trial court offered defendant clothing for trial, but defendant refused. The prosecutor provided defendant with writing implements, but defendant threw them on the floor. The court admonished defendant that if he became disruptive, he would be removed from the courtroom and his trial would take place in his absence. Defendant then refused to acknowledge the court or answer its questions.

¶ 25        During *voir dire*, in front of the prospective jurors, defendant complained that he was sick and asked to lay down on the floor. He stated that he had not eaten in a week and that his mother was dying. Defendant also complained about construction noise, claiming he could not hear. Defendant stated he wanted to leave the courtroom. The trial court admonished him that he had the right to leave but, if he did, he would give up his right to be present during trial. In the presence of the potential jurors, defendant proclaimed his innocence, called the proceedings a "joke," stated he was denied "all [his] witnesses, all [his] discovery," referred to one witness as a "dope-fiend" and "whore," and accused another of being a "dope dealer." The court asked the bailiff to remove defendant, noting for the record, "[Defendant] is now trying to discuss the case directly with the jury. He has indicated he wants to leave. He is leaving." The court continued with *voir dire* in defendant's absence.

¶ 26        Prior to selecting the jurors, the trial court recessed and ordered defendant to be brought to the courtroom. The court offered to move the trial across the hall to help with the

construction noise and asked defendant if he wished to be present for his trial or be taken back to his cell. In response, defendant asked for a furlough to visit his sick mother. When the court denied that request and asked defendant if he wanted to participate in the trial, defendant refused to speak. The court noted that the last thing defendant told the court was that he did not want to be present during trial. The court admonished defendant that he would be waiving his right to confront and cross-examine witnesses and his right to testify. The court then asked defendant if there was anything he wished to say, and defendant remained silent. The court had defendant returned to the jail and informed the bailiff to bring defendant back if he changed his mind.

¶ 27 After jury selection, the trial court brought defendant to court to give him one more opportunity to participate in his trial. Defendant filed affidavits of third parties that he claimed proved his innocence and asked for more time to subpoena the affiants to testify at trial. The trial court denied the request and again asked defendant if he wanted to participate in his trial. Defendant stated that he was sick, unable to understand what was going on, and unable to represent himself effectively due to his incarceration. When the court again asked defendant if he wanted to participate in his trial, he refused to respond. Defendant was escorted back to jail.

¶ 28 Defendant also refused to leave his cell to attend the second day of his trial. The court found that defendant was exercising his right not to be present for trial but instructed the jail administrator to check on him every 30 minutes to see if he changed his mind.

¶ 29 2. *The Evidence Presented*

¶ 30 a. B.L.M.

¶ 31 B.L.M. testified that she met defendant at a market in Quincy a few days before January 30, 2018. The pair exchanged messages over Facebook, which the State introduced at trial. In the messages, defendant stated that he was interested in meeting B.L.M. He explained that he

had a wife who was in her sixties and that he and his wife would pay B.L.M. money if she cleaned their house. Defendant stated that his wife would be present and that he and his wife were looking forward to conversing with B.L.M. After learning that B.L.M. did not have a washer and dryer, defendant told B.L.M. that she could also do her own laundry at his house while she was cleaning. B.L.M. eventually agreed to go to defendant's home.

¶ 32　　　　On the morning of January 30, 2018, B.L.M. arrived at defendant's home around 3 or 4 a.m. When B.L.M. walked inside the house, she saw defendant's wife laying on her bed in a room just off the entryway. Defendant introduced B.L.M. to his wife, but she appeared uninterested in meeting B.L.M.

¶ 33　　　　B.L.M. then went upstairs with defendant to the laundry room. While her clothes were in the washer, she and defendant sat in the laundry room and talked. After about 30 minutes, defendant's wife joined them, but she left after about 30 to 45 minutes.

¶ 34　　　　When B.L.M.'s laundry was nearly done, defendant (1) asked her to try on a pair of underwear for money and (2) tried to kiss her. B.L.M. tried to get him to stop by biting his tongue. Defendant choked her and threatened to kill her by snapping her neck. He stopped choking her right before she blacked out. Defendant then undressed her and tried to perform oral sex on her. B.L.M. resisted, and defendant forced her out of the laundry room and into a bedroom.

¶ 35　　　　In the bedroom, defendant forced B.L.M. to lie on the bed and told her he would kill her if the police showed up. He then forced B.L.M. to perform oral sex on him and then penetrated her vaginally. As this was happening, defendant's wife came upstairs and, according to B.L.M., "pretended" to try to get in the locked door. B.L.M. explained that the room had two doors and that defendant's wife never tried to enter through the other, unlocked door.

¶ 36　　　　B.L.M. estimated that she was in the bedroom for about three hours. Defendant then

made her go into the bathroom, where he penetrated her anally. He also made her perform oral sex on him again. Defendant threatened B.L.M. throughout the entire assault.

¶ 37    Defendant eventually told B.L.M. to go into the bathroom and clean herself up. She acted as if she were complying but only lightly rinsed herself. The whole time she had been at his house, B.L.M had been telling defendant that she had to work at 11 a.m. and if she was not there, someone would know she was missing. Defendant let her go at 11 a.m. B.L.M testified that defendant made her kiss him on the porch before she could leave "because his neighbors had cameras and he wanted it to look normal." B.L.M. drove directly to her mother's house.

¶ 38                                b. Chay S.

¶ 39    Chay S. testified that she was B.L.M.'s mother and they lived together. In the late morning on the day of the offense, B.L.M. was supposed to be at work but instead walked through the kitchen door. B.L.M. looked at her mother and began crying. B.L.M. was too distraught to talk and Chay had to console her for 10 to 15 minutes. B.L.M. asked her mother to call a friend. The friend came immediately, and B.L.M. told them both that defendant had raped her several times. Chay took B.L.M. to the emergency room and remained with her while she was examined.

¶ 40    A few days later, on February 2, 2018, Chay accompanied B.L.M. to the Quincy Police Department where Detective Nick Eddy conducted a "formal interview" of B.L.M. Chay sat in on the interview. The prosecutor asked, "Over the course between January 30th—you have described her emotional state—until she was interviewed on February 2nd, did her emotional state still continue to be—did she continue to be very upset?" Chay answered, "[Y]es."

¶ 41                        c. Law Enforcement Witnesses

¶ 42                            *i. Andrew Abbott*

¶ 43    Andrew Abbott testified that he was employed as a police officer with the City of

Quincy. On the day of the offense, he was dispatched to the hospital, where he took B.L.M.'s statement. She identified defendant by name as the offender. Abbott determined that investigators should be involved. Detectives Kris Billingsley and Nick Eddy of the Quincy Police Department arrived at the hospital and took over the investigation.

¶ 44                                    *ii. Kris Billingsley*

¶ 45        Billingsley testified that he arrived at the hospital with Eddy and Abbott briefed them on the information he had received from B.L.M., including defendant's name and address. Billingsley and Eddy drove by defendant's home and took photographs. They returned to the hospital and nurse Kaylie Gilbert provided Billingsley the sexual assault kit she had administered on B.L.M.

¶ 46                                    *iii. Nick Eddy*

¶ 47        Eddy testified that he responded to the hospital with Billingsley and, after being briefed by Abbott, drove by defendant's home and took photographs. Eddy and Billingsley returned to the hospital and showed B.L.M. the photographs they had taken. She identified the home as the location where defendant had sexually assaulted her. Eddy and Billingsley then attempted to interview her but were unable to "get a complete statement from her." Eddy explained that when he tried to talk to B.L.M. about the incident "she became very emotional, crying, and couldn't speak to me because she was crying." Eddy testified that he arranged with B.L.M. to interview her on a later date.

¶ 48        Eddy stated that he interviewed B.L.M. on February 2, 2018, at the Department of Children and Family Services office in Quincy. He described her as "still very overcome by the incident" and testified that "[s]he would break down and cry when we talked about it." The prosecutor asked the trial court permission to "play a small portion of [the video] without the audio

on to show the demeanor of [B.L.M.] during that February 2nd interview." The court granted permission and the State played a video clip of approximately 4 minutes and 44 seconds duration. The video depicted B.L.M. crying and composing herself.

¶ 49    Eddy testified that he and Billingsley went to defendant's home. Defendant let them in and escorted them to the laundry room. The detectives tried to question defendant about the assault, but defendant did not go into detail when asked direct questions. When the detectives asked to speak with his wife, defendant refused and asked them to leave.

¶ 50    Eddy also testified that he separately collected buccal swabs from defendant and B.L.M. and sent them to the state crime lab for DNA analysis.

¶ 51                    d. Medical and Scientific Witnesses

¶ 52                        *i. Malinda Vogel*

¶ 53    Malinda Vogel testified as an expert witness "as a licensed clinic professional counselor who is qualified to evaluate clients with [PTSD]." Vogel stated that the Adams County State's Attorney's Office referred B.L.M. to her for an "independent evaluation." She met with B.L.M. twice, in November and December 2019. Vogel testified that B.L.M. described being raped and being held for a "period of several hours" at defendant's home. Vogel testified that B.L.M "clearly met the criteria for [PTSD] *** as a result of the sexual assault." Vogel described the symptoms B.L.M. reported that supported Vogel's diagnosis, such as intrusive memories of the assault, nightmares, difficulty sleeping, depression, anxiety, physiological changes, and hypervigilance.

¶ 54                        *ii. Kaylie Gilbert*

¶ 55    Gilbert, a sexual assault nurse examiner, testified that she administered a sexual assault kit on B.L.M. at Blessing Hospital on January 30, 2018. She described B.L.M. as having

"tremors, very shaky, anxious and tearful, choking back words." Gilbert testified that B.L.M. provided her with the following description of events:

"She told me that in the early morning hours, she had gone to a man's home to clean his house. She was trying to get some money to help out a friend, and she was directed to go there to help clean to gain some money. And after a few hours of doing some chores and some laundry, the man told her that if he was not allowed to have sex with her, that he was going to kill her."

¶ 56　　　　Gilbert also testified that B.L.M. told her that defendant "penetrated [B.L.M.] with his penis orally, vaginally and anally," "ejaculated in her mouth and around her lips," "licked the left side of her neck and her left ear," and "choked her and grabbed her by the neck and her hair several times to restrain her." Gilbert collected swabs from B.L.M.'s body and observed a "large area of bruising on the left side of her neck a few inches long, couple inches wide. There were some abrasions, like shearing of skin." When Gilbert took combings from B.L.M.'s hair, an unusual amount of hair came out, which Gilbert stated was consistent with B.L.M.'s report of her hair being pulled during the assault.

¶ 57　　　　Additionally, a copy of the patient consent form for administration of the sexual assault kit was admitted into evidence and sent back with the jury during deliberations. On this form, Gilbert had written B.L.M.'s description of the assault, which was consistent with Gilbert's testimony.

¶ 58　　　　　　　　　　　　　　*iii. Dana Pitchford*

¶ 59　　　　Dana Pitchford, a forensic scientist, performed DNA analysis of the contents of the sexual assault kit. Pitchford's analysis revealed that defendant was included as a possible contributor to male DNA profiles identified in the swabs collected from B.L.M.'s vagina, external

labia, mouth, left ear, and neck. She identified the statistical probabilities of finding defendant's DNA on the various swabs taken from B.L.M.'s body as follows: (1) vaginal swab, 1 in 4 male Caucasians; (2) oral swab, 1 in 6.9 million male Caucasians; (3) external labia, 1 in 25 male Caucasians; (4) left ear, 1 in 7.2 nonillion male Caucasians; and (5) neck, 1 in 160 quadrillion male Caucasians.

¶ 60                                3. *The Verdict*

¶ 61          During deliberations, the jury sent a note asking the following: "Is there evidence from the ER nurse's medical exam, meaning report, or the statement from the stand." The trial court responded that the exhibit the jury was requesting was included in the exhibits that were sent back to the jury room. (The court was referring to the copy of the patient consent form for the administration of the sexual assault kit, which contained Gilbert's notes regarding B.L.M.'s description of the assault.) The jury ultimately found defendant guilty of all four counts.

¶ 62                                D. Posttrial Proceedings

¶ 63          The week following the jury's verdict, defendant *pro se* filed a motion requesting, among other things, "[the] appointment of private counsel or a [public defender] from a conflict-free county." The trial court ultimately appointed the public defender's office, which filed a motion for a new trial alleging the court erred by, among other things, (1) denying defendant's motion for standby counsel, (2) conducting the jury trial in defendant's absence, (3) taking defendant's silence as a waiver of counsel, and (4) allowing Vogel to testify regarding her diagnosis of PTSD when Vogel had been retained by the State.

¶ 64          In September 2019, the trial court conducted a hearing on defendant's motion for new trial and sentencing hearing. Defendant moved to proceed *pro se*. After admonishing defendant, the court granted his request, and defendant adopted counsel's posttrial motion. During

the hearing on the posttrial motion, defendant again became disruptive, calling the judge a "disgrace to the bench" and telling the judge he would "burn in hell." Defendant insisted on leaving the courtroom after being admonished that he would be sentenced in his absence.

¶ 65        The trial court denied the motion for a new trial and sentenced defendant to nine years and eight months in prison on each of the criminal sexual assault counts and one year in prison on the unlawful restraint count, with the sentences to be served consecutively. Defendant filed a motion for a new sentencing hearing, which the court also denied.

¶ 66        This appeal followed.

¶ 67                                II. ANALYSIS

¶ 68        Defendant appeals, arguing that the trial court erred by (1) denying defendant's requests for standby counsel, (2) admitting testimony from a sexual assault nurse examiner that did not fall within the medical diagnosis exception to the hearsay rule, (3) admitting cumulative and prejudicial evidence of the victim's demeanor after the alleged assault, and (4) entering a conviction on the unlawful restraint count because it is a lesser-included offense of criminal sexual assault.

¶ 69        We disagree and affirm.

¶ 70                A. The Trial Court's Denial of Standby Counsel

¶ 71                    1. *The Applicable Law and Standard of Review*

¶ 72                        a. The Right to Self-Representation

¶ 73        "[T]he Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.' " *Faretta v. California*, 422 U.S. 806, 814 (1975). Accordingly, the sixth amendment (U.S. Const., amend. VI) guarantees a criminal defendant the right to represent himself. *People v. Silagy*, 101 Ill. 2d 147, 179, 461 N.E.2d 415,

431 (1984)(citing *Faretta*, 422 U.S. 806, and Ill. Const. 1970, art. I, § 8).

¶ 74        Because a defendant who chooses to represent himself "relinquishes *** many of the traditional benefits associated with the right to counsel," "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." (Internal quotation marks omitted.) *Faretta*, 422 U.S. at 835. "Although a court may consider [a defendant's] decision [to represent himself] unwise, if it is freely, knowingly and intelligently made, that decision must be accepted out of 'that respect for the individual which is the life-blood of the law.' " (Internal quotation marks omitted.) *Ward*, 208 Ill. App. 3d at 1080 (quoting *Silagy*, 101 Ill. 2d at 179-80).

¶ 75        Before accepting a waiver of the right to counsel, the trial court must determine whether a defendant has the "requisite capacity" to make a knowing and intelligent waiver of that right. *Id.* at 1082. The competency standard for waiving counsel is the same as the competency standard to stand trial. See *Godinez v. Moran*, 509 U.S. 389, 396, 398-99 (1993) ("[W]e reject the notion that competence to *** waive the right to counsel must be measured by a standard that is higher than (or even different from) the [*Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*)] standard" of competency to stand trial, which is a defendant's (1) " 'present ability to consult with his lawyer' " and (2) " 'rational as well as factual understanding of the proceedings against him.' "). The factors courts generally consider when determining whether a defendant has the capacity to make a knowing and voluntary waiver of his right to counsel are the defendant's (1) age, (2) level of education, (3) mental capacity, and (4) prior involvement with the legal system. *Ward*, 208 Ill. App. 3d at 1081 (citing *People v. Davis*, 169 Ill. App. 3d 1, 6, 523 N.E.2d 165, 168 (1988)).

¶ 76        Once the trial court has found that a defendant has the requisite competency to waive counsel, the court must also find that his waiver of the constitutional right is knowing and

voluntary. *Godinez*, 509 U.S. at 400, 402 ("[W]hen a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted."). "In this sense there is a 'heightened' standard for *** waiving the right to counsel, but it is not a heightened standard of competence." (Emphases omitted.) *Id.* at 400-01.

¶ 77 To ensure a defendant's waiver of counsel is knowing and voluntary, the trial court should make a defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." (Internal quotation marks omitted.) *Faretta*, 422 U.S. at 835. A defendant "need not himself have the skill and experience of a lawyer in order [to] competently and intelligently *** choose self-representation." *Id.* "[T]echnical legal knowledge," such as "the intricacies of the hearsay rule," or "provisions that govern challenges of potential jurors on *voir dire*" are not relevant to a knowing exercise of the right to self-representation. *Id.* at 836.

¶ 78 Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) governs the waiver of counsel and requires only that, before accepting a waiver of counsel, the trial court must address the defendant personally in open court and determine that he understands (1) the nature of the charge, (2) the minimum and maximum sentence he could receive, and (3) that he has a right to counsel (and, if indigent, appointed counsel).

¶ 79 In *Ward*, 208 Ill. App. 3d at 1081-82 (citing 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 11.5(a)-(c), at 42-45 (1984)), this court suggested that it would be desirable for a trial court to also warn a defendant of the following concerns:

"(1) presenting a defense is not a simple matter of telling one's story, but requires adherence to various technical rules governing the conduct of the trial;

(2) a lawyer has substantial experience and training in trial procedure and the prosecution will be represented by an experienced attorney;

(3) a person unfamiliar with legal procedures (a) may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, (b) may not make effective usage of such rights as the *voir dire* of jurors, and (c) may make tactical decisions that produce unintended consequences;

(4) the defendant proceeding *pro se* will not be allowed to complain on appeal about the competency of his representation;

(5) the effectiveness of his defense may well be diminished by his dual role as attorney and accused;

(6) defendant will receive no special consideration from the court;

(7) defendant will receive no extra time for preparation or greater library time (if in prison);

(8) a lawyer can render important assistance (a) by determining the existence of possible defenses to the charges against defendant, (b) through consultations with the prosecutor regarding possible reduced charges or lesser penalties, and (c) in the event of a conviction, by presenting to the court matters which might lead to a lesser sentence;

(9) in the event the court accepts defendant's decision to represent himself, defendant will not be given an opportunity to change his mind during trial; and

(10) if the court in its discretion is not going to appoint standby counsel, to specifically inform the defendant that there will be no standby counsel to assist him at any stage during trial."

¶ 80      A trial court's failure to give these "*Ward* admonitions" is not grounds for reversal of an otherwise valid waiver of counsel. *People v. Williams*, 277 Ill. App. 3d 1053, 1058, 661 N.E.2d 1186, 1189-90 (1996). However, a court's reading of the *Ward* admonitions may dissuade a defendant's unwise decision to waive counsel and represent himself, "resulting in both more effective representation for him and smoother, less difficult courtroom proceedings for the court." *Id.*

¶ 81      The trial court's using the *Ward* admonitions is important for two separate reasons. First, after hearing the *Ward* admonitions, a defendant will have a better understanding of the daunting task before him and may be dissuaded from the unwise decision to represent himself. Second, if a defendant is not so persuaded, a trial court's reading of the *Ward* admonitions provides a clear record that the defendant (1) understood the perils of representing himself and (2) understandingly, knowingly, and voluntarily waived his right to be represented by counsel.

¶ 82      The tenth *Ward* admonition—a general admonition that there may be no assistance of standby counsel if the court, in its discretion, determines not to appoint standby counsel—is central to this appeal. We now turn our focus to a discussion of standby counsel.

¶ 83                         b. The Appointment of Standby Counsel

¶ 84      "[A] defendant who chooses to represent himself must be prepared to do so." *Id.* A *pro se* defendant does not have a right to standby counsel. *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 42, 987 N.E.2d 837. Nonetheless, because "there is no state statute or court rule to the contrary, such appointment is permissible." *Id.* In *People v. Gibson*, 136 Ill. 2d 362, 380, 556 N.E.2d 226, 233 (1990), the Illinois Supreme Court set forth the "[r]elevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant"—namely, "[(1)] the nature and gravity of the charge, [(2)] the expected factual and

legal complexity of the proceedings, and [(3)] the abilities and experience of the defendant."

¶ 85                                    i. *The Standard of Review*

¶ 86            A trial court has broad discretion in deciding whether to appoint standby counsel, and a reviewing court will uphold the trial court's decision absent an abuse of discretion. *Williams*, 277 Ill. App. 3d at 1058. An abuse of discretion will be found only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89, 792 N.E.2d 1163, 1188 (2001). "This court has recently reiterated that '*no* trial court in Illinois has been reversed for exercising its discretion to *not* appoint standby counsel ***.' " (Emphases in original.) *Ellison*, 2013 IL App (1st) 101261, ¶ 42 (quoting *People v. Pratt*, 391 Ill. App. 3d 45, 57, 908 N.E.2d 137, 147-48 (2009), and quoting *Williams*, 277 Ill. App. 3d at 1061).

¶ 87             ii. People v. Williams: *Potential Problems With Standby Counsel*

¶ 88            In *Williams*, 277 Ill. App. 3d at 1059, this court observed that "[t]he appointment of standby counsel frequently creates more problems than it solves." We first examined the problems created by the ambiguity of the role of standby counsel—namely, that "(1) no 'bright line' exists regarding the role of standby counsel, and (2) appointing standby counsel provides a convicted *pro se* defendant the opportunity to argue on appeal that standby counsel either violated the defendant's *Faretta* right to proceed *pro se* or otherwise acted improperly." *Id.* at 1060.

¶ 89            The ambiguity of the role of standby counsel was highlighted in *McKaskle v. Wiggins,* 465 U.S. 168, 170 (1984), where the trial court appointed standby counsel to assist the defendant in his robbery trial. The defendant repeatedly changed his mind regarding his standby counsel's role, "object[ing] even to the court's insistence that counsel remain available for consultation" on one day, then consulting with standby counsel during cross-examination of a

- 21 -

witness and asking him to conduct *voir dire* of another witness on the next day. *Id.* at 172. After the defendant was convicted, he filed a *habeas* petition in federal district court, complaining that standby counsel's conduct violated defendant's *Faretta* right to self-representation. *Id.* at 173. The Fifth Circuit Court of Appeals agreed, holding that the defendant's sixth amendment right of self-representation "was violated by the unsolicited participation of overzealous standby counsel." *Id.* The Fifth Circuit held that standby counsel is " ' "to be seen, but not heard" ' " and further explained that standby counsel's role " 'is there for advisory purposes only, to be used or not used as the defendant sees fit.' " *Id.*

¶ 90    The United States Supreme Court disagreed and reversed the Fifth Circuit, holding that the defendant's *Faretta* rights were not violated, and writing as follows:

> "*Faretta* affirmed the defendant's constitutional right to appear on stage at his trial. We recognize that a *pro se* defendant may wish to dance a solo, not a *pas de deux*. Standby counsel must generally respect that preference. But counsel need not be excluded altogether, especially when the participation is outside the presence of the jury or is with the defendant's express or tacit consent. The defendant in this case was allowed to make his own appearances as he saw fit. In our judgment counsel's unsolicited involvement was held within reasonable limits." *Id.* at 187-88.

¶ 91    The Supreme Court defined those "reasonable limits" in only two broad strokes: (1) "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury" and (2) "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178. The Court summarized its holding as follows:

"Thus, *Faretta* rights are adequately vindicated in proceedings outside the presence of the jury [(1)] if the *pro se* defendant is allowed to address the court freely on his own behalf and [(2)] if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." *Id.* at 179.

Accordingly, whether a standby counsel's conduct in front of the jury violates *Faretta* in any given trial is determined on a case-by-case basis, and the *McKaskle* guidelines provide only general guidance.

¶ 92 Moreover, *McKaskle* leaves unaddressed the question of how a trial court should referee—and a reviewing court determine—out-of-court disagreements between a defendant and standby counsel that result in claims of ineffective assistance of counsel, such as an allegation that standby counsel gave deficient legal advice upon which the defendant relied in developing his trial strategy. Or, as this court observed in *Williams*, "a defendant might claim that standby counsel improperly interfered with the defendant's preparation for—or presentation at—trial based upon conversations that, by definition, the court was not and could not be privy to." *Williams*, 277 Ill. App. 3d at 1060. *McKaskle* instructs only how a trial court should determine disagreements that are brought to its attention, but not disagreements that have occurred off-the-record and of which the court is aware only when a disagreement arises as a posttrial claim of ineffective assistance.

¶ 93 A trial court, when deciding whether to appoint standby counsel, can and should consider these potential problems. We note that other courts have agreed with and applied this court's analysis in *Williams*. See *People v. Curry*, 2022 IL App (2d) 210260-U, ¶ 73 (citing *Williams* and affirming the trial court's denial of standby counsel); *People v. Hui*, 2022 IL App

(2d) 190846, ¶ 63 (same); *People v. Khan*, 2021 IL App (1st) 190679, ¶ 78, 186 N.E.3d 431 (same); *Ellison*, 2013 IL App (1st) 101261 (same); *Pratt*, 391 Ill. App. 3d at 57 (same); *People v. Smith*, 377 Ill. App. 3d 458, 461, 878 N.E.2d 1222, 1225 (2007) (same); *People v. Phillips*, 392 Ill. App. 3d 243, 265, 911 N.E.2d 462, 483 (2009) (same); *People v. Parker*, 335 Ill. App. 3d 474, 486, 781 N.E.2d 1092, 1102 (2002) (same).

¶ 94 Of particular note, in *People v. Mazar*, 333 Ill. App. 3d 244, 250-51, 775 N.E.2d 135, 141 (2002), *abrogated on other grounds by, People v. Breedlove*, 213 Ill. 2d 509, 515-16, 821 N.E.2d 1176, 1180 (2004), then-appellate court Justice Anne Burke, in affirming the trial court's denial of the defendant's request for standby counsel, (1) discussed the problems associated with the appointment of standby counsel that this court identified in *Williams* and (2) cited *Williams* with approval, stating "[*Williams*] emphasizes the problems with appointment of standby counsel and confirms that the trial court's comments here to defendant were proper."

¶ 95 In contrast to these potential pitfalls arising from the appointment of standby counsel, we reiterate that "*no* trial court in Illinois has been reversed for exercising its discretion to *not* appoint standby counsel." (Emphases in original.) *Williams*, 277 Ill. App. 3d at 1061. Moreover, when standby counsel violates a defendant's *Faretta* right, "that violation on appeal *cannot* be viewed as harmless error; instead, reversal must occur no matter how strong the State's case may have been." (Emphasis in original.) *Id.* (citing *McKaskle*, 465 U.S. at 177 n.8). Accordingly, a trial court that appoints standby counsel believing it is mitigating the risk of reversal may actually be heightening that risk.

¶ 96 The result in *Gibson*, 136 Ill. 2d 362, is no exception to that rule. In *Gibson*, the Illinois Supreme Court reversed the defendant's conviction and remanded for a new trial because the trial court, after appointing the public defender as standby counsel, later granted the public

defender's motion to withdraw on the mistaken basis that the court lacked the authority to make such an appointment under the Public Defender Act (Ill. Rev. Stat. 1987, ch. 34, ¶¶ 5601-5608). *Gibson*, 136 Ill. 2d at 376-77, 379. *Gibson* is unique in that the supreme court's reversal was due to the trial court's mistaken belief that it did not have the authority to appoint standby counsel, as opposed to the trial court's exercise of its discretion.

¶ 97 *Gibson* is also unique in that it was a death penalty case. That is to say, in *Gibson*, two of the three factors trial courts should consider when deciding whether to appoint standby counsel—namely, "the nature and gravity of the charge" and the "legal complexity of the proceedings"—were as serious as it gets in Illinois jurisprudence. However, the death penalty is no longer available in Illinois. A court deciding whether to appoint standby counsel, and therefore weighing the *Gibson* factors, should be aware of *Gibson*'s unique facts, which are now incapable of repetition.

¶ 98                                    2. *This Case*

¶ 99 Defendant argues that the trial court abused its discretion by denying defendant's request for standby counsel because (1) the court's comments demonstrated that its decision was based on a blanket policy and not an application of the *Gibson* factors and (2) to the extent the court's decision was based on its belief that defendant was capable of representing himself, this belief was erroneous because defendant (a) admitted he had never examined a witness, (b) demonstrated that he did not know how to obtain proper notarization of affidavits, and (c) advised the court that he did not know how to issue subpoenas. Defendant further contends that, without standby counsel, the State was permitted to present its evidence completely unchallenged, including the admission of inadmissible evidence such as the hearsay testimony of the sexual assault nurse examiner. Defendant asserts on appeal that because the resulting prejudice

was "incalculable," he should receive a new trial.

¶ 100    We reject all of defendant's claims.

¶ 101                    a. Application of the *Gibson* Factors

¶ 102    First, to support his argument that the trial court improperly applied a blanket policy against the appointment of standby counsel, defendant refers only to the following comments by the court, made in August 2018 when ruling on the defendant's request to represent himself:

> "The Court does have, I believe in its discretion, the ability to appoint standby counsel, and I am going to tell you that as I am of the belief that [doing so] puts an attorney in a difficult position as far as the role that they are actually serving[.] *** [I]t would be my intention in using my discretion not to appoint standby counsel to represent you or be present during any stage of the trial. Do you understand that?"

When the court made these comments, the court was giving the admonitions suggested in *Ward*. In particular, the court was discussing the tenth *Ward* admonition, which refers to the generally wiser course of *not* appointing standby counsel. It was not only appropriate for the trial court to do so, but commendable. As discussed (*supra* ¶ 81), admonishing a defendant in this manner will either (1) dissuade the defendant from pursuing an unwise course of action or (2) create a clear record that defendant knowingly waived his right to counsel with a clear understanding of all the attendant risks.

¶ 103    Moreover, in his argument to this court, defendant omits the following lengthy and material comments from the trial court's ruling, months later, on defendant's *actual*, subsequent motion for standby counsel:

> "[I]t certainly would be *improper* for the Court to have some blanket policy in place

where you wouldn't, under any circumstances, appoint standby counsel. So the record is clear *I am not exerting any blanket policy with respect to your case*, [defendant], or anyone other's and I would likewise recognize that whether or not standby counsel is appointed or not is a discretionary matter. It is purely within the discretion of the Court to do that, and in considering that, the Court is obligated to consider three factors: Number one, the nature and gravity of the charges; second the expected factual and legal complexity of the proceedings; third the abilities and experience of the Defendant. Those are factors the court is obligated to consider and that are enumerated in [*Gibson*]." (Emphases added.)

Through these comments, the trial court (1) acknowledged the impropriety of applying a blanket policy, (2) expressly stated it was not applying such a policy in defendant's case, (3) acknowledged its obligation to exercise its discretion, and (4) correctly recited the *Gibson* factors that it was obligated to consider. Indeed, we commend the trial court for its careful analysis and explicit explanation of its reasons for declining to appoint standby counsel. Its remarks on this matter could serve as a model for other trial courts when addressing a defendant's request for standby counsel.

¶ 104 In applying the *Gibson* factors, the trial court first found that the nature of the charges against defendant were "very serious in nature." The court then addressed the factual and legal complexity of the proceedings and defendant's abilities together and determined that it would exercise its discretion to deny the appointment of standby counsel.

¶ 105 The record supports the trial court's decision. As the State points out, defendant stated that he had "successfully defended [himself] in several cases," "litigated quite a bit" while incarcerated for 24 years, and had participated in both criminal and civil matters. Indeed, the record establishes that defendant was able to read and comprehend Illinois law. Throughout the

proceedings in the trial court, defendant clearly articulated legal issues and legal arguments. He filed several *pro se* motions on pretrial issues that demonstrated an understanding of law and procedure in criminal cases well above that of the average *pro se* defendant. The court's decision was far from arbitrary, fanciful, or unreasonable.

¶ 106                    b. Defendant's Alleged Lack of Capability

¶ 107          Next, defendant argues that because (1) the case involved DNA analysis, (2) defendant did not know how to complete procedural tasks, and (3) the absence of standby counsel left the State's evidence unchallenged, the trial court's decision was erroneous. However, these contentions do not support defendant's claim that the court abused its discretion by not appointing standby counsel; instead, these contentions merely underscore the foolishness of defendant's decision to proceed *pro se*.

¶ 108          A defendant who has been offered counsel in a serious case and who rejects that offer must live with the consequences of his decision to exercise his right of self-representation, no matter how imprudent that decision may seem. And that defendant is deserving of no pity for the consequences of his imprudent decision. Accordingly, we emphatically reject defendant's argument that the trial court's denial of standby counsel was erroneous because it left him disadvantaged in this litigation. Defendant was warned of this potential consequence when he waived his right to counsel, yet he disregarded those warnings and elected to proceed *pro se*.

¶ 109          3. *Another Problem with the Appointment of Standby Counsel*

¶ 110          We note that this case illustrates yet *another* problem that the appointment of standby counsel can create. In this case, defendant intentionally and repeatedly misbehaved before the trial court and the jury. He was removed from the courtroom on several occasions. Yet, defendant's outrageous behavior could very well have been his trial strategy, however unwise.

Indeed, defendant's very argument on appeal is that his convictions should be reversed because his absence from his jury trial, without standby counsel to step in, prejudiced him.

¶ 111    If defendant's trial strategy *was* to prejudice the jury or claim that the trial court was biased against him, what would standby counsel do if, upon execution of the "removal from the courtroom portion" of defendant's trial strategy, standby counsel was called upon to participate? Standby counsel could not, within the bounds of professional conduct, continue with defendant's strategy. At that point, defendant's strategy would be overborn, which *McKaskle* instructs cannot be done without violating a defendant's *Faretta* right.

¶ 112    Although this example (and defendant's conduct in this case) may be extreme, it demonstrates how standby counsel can be placed in an ethical and legal conundrum—unable to follow the rules of professional conduct without violating the Supreme Court's command in *Faretta*.

¶ 113    This case also presents the same concern identified by the Second District in *Hui*, 2022 IL App (2d) 190846, ¶ 63, that the appointment of standby counsel "provides an unsuccessful *pro se* defendant the opportunity to argue on appeal that standby counsel either violated his right to proceed *pro se* or otherwise acted improperly." In *Hui*, the Second District found no abuse of discretion in the trial court's decision to not appoint the public defender as standby counsel when the defendant had previously complained of that office's performance and sought its discharge.

¶ 114    Here, like in *Hui*, defendant was represented by two attorneys in the public defender's office and complained repeatedly about their performance. He also retained private counsel and complained of her performance, as well. On this record, the likelihood is that defendant would also complain of standby counsel's performance if the trial court had appointed standby counsel.

¶ 115                    B. The Trial Court's Admission of Hearsay Evidence and Demeanor Evidence

¶ 116                    Defendant next argues the trial court erred by (1) allowing the sexual assault nurse examiner to testify about B.L.M.'s hearsay statements regarding the events leading up to the sexual assault and (2) allowing excessive and prejudicial evidence of B.L.M.'s demeanor or mental state after the sexual assault through (a) the video of B.L.M.'s February 2018 interview with police and (b) Vogel's diagnosis of PTSD.

¶ 117                    Defendant acknowledges that these claims were not preserved for appeal because he did not raise a contemporaneous objection at trial. However, defendant requests review under the first prong of the plain error doctrine.

¶ 118                    We reject his request.

¶ 119                              1. *The Plain-Error Doctrine*

¶ 120                    The plain-error doctrine is a well-established exception to forfeiture principles and allows a reviewing court the discretion to consider unpreserved error under two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Moon*, 2022 IL 125959, ¶¶ 19-20.

¶ 121                    The typical first step in an analysis under either prong of the plain-error doctrine is to determine whether any clear or obvious error occurred at all. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 71, 112 N.E.3d 657. The next step under the plain-error doctrine depends on the defendant's argument. When, as here, a defendant claims first-prong plain error, "a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error

alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. "A reviewing court's inquiry" involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 122                                              2. *This Case*

¶ 123          Although the "typical" first step in a plain-error analysis is to determine whether any error occurred at all, that step need not be taken when, as here, the evidence of the defendant's guilt is overwhelming. Put another way, because (1) it is the defendant's burden to establish plain error and (2) he must demonstrate *both* (a) clear or obvious error occurred and (b) the evidence was closely balanced, if it is apparent that the evidence is *not* closely balanced, defendant cannot establish plain error.

¶ 124          In the present case, even if we were to assume that the trial court erred, as defendant claims, by admitting (1) Gilbert's testimony about B.L.M.'s hearsay statements about the events leading up to the sexual assault and (2) excessive evidence of B.L.M.'s demeanor after the sexual assault, the evidence in this case was far from closely balanced. B.L.M. gave a detailed account of the hours-long assault she suffered at defendant's hands. Her account was uncontradicted and was corroborated by DNA evidence. Forensic scientists found DNA consistent with defendant's known DNA profile on the parts of B.L.M.'s body where she said it would be. B.L.M.'s account was also corroborated by Gilbert's observations during the sexual assault exam. Gilbert documented bruising, abrasions, and falling hair consistent with B.L.M.'s account. Chay and Eddy described B.L.M.'s demeanor (1) upon B.L.M.'s return home and (2) at the hospital. Their descriptions were

consistent with B.L.M. having suffered a traumatic event.

¶ 125 Defendant presented no evidence that contradicted B.L.M.'s testimony, and all the evidence presented by the State was consistent with defendant's guilt.

¶ 126 Because the evidence of defendant's guilt is overwhelming, he cannot meet his burden of showing *both* that (1) clear or obvious error occurred *and* (2) the evidence was closely balanced. Because defendant cannot establish plain error, we honor his forfeiture.

¶ 127 C. Defendant's Unlawful Restraint Conviction

¶ 128 Last, defendant argues that his conviction and sentence for unlawful restraint should be vacated because unlawful restraint is a lesser-included offense of criminal sexual assault. Specifically, defendant contends that, because it is impossible to commit a forcible sexual assault without "detaining the person assaulted *** a conviction and sentence for both criminal sexual assault and unlawful restraint punishes a person twice for the same act in violation of the one-act, one-crime doctrine." Defendant acknowledges that this issue was not properly preserved for review but requests review under the second prong of the plain-error doctrine.

¶ 129 A violation of the one-act, one-crime doctrine is reviewable under the second prong of the plain-error doctrine as "an obvious error so serious that it challenges the integrity of the judicial process." *People v. Coats*, 2018 IL 121926, ¶ 10, 104 N.E.3d 1102.

¶ 130 1. *The Applicable Law and Standard of Review*

¶ 131 Under the one-act, one-crime doctrine, a defendant cannot be convicted of multiple offenses "carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977). A one-act, one-crime analysis involves a two-step process. *Coats*, 2018 IL 121926, ¶ 12. First, a reviewing court determines whether the defendant's conduct involved multiple acts or a single act. *People v. Miller*, 238 Ill. 2d 161, 165, 938 N.E.2d 498, 501 (2010). For purposes

of the doctrine, the definition of an "act" is " 'any overt or outward manifestation which will support a different offense.' " *In re Rodney S.*, 402 Ill. App. 3d 272, 282, 932 N.E.2d 588, 597 (2010) (quoting *King*, 66 Ill. 2d at 566). Multiple convictions are permitted when a defendant has committed separate acts, despite the interrelationship of those acts. *People v. Poe*, 385 Ill. App. 3d 763, 766, 896 N.E.2d 453, 456 (2008). Likewise, a defendant can be convicted of two offenses even when a common act is a part of both offenses. *People v. Williams*, 384 Ill. App. 3d 327, 339, 892 N.E.2d 620, 631 (2008). Two or more separate acts do not become one act merely because of proximity of time and location. *People v. Pearson*, 331 Ill. App. 3d 312, 322, 770 N.E.2d 1183, 1193 (2002).

¶ 132     Second, if the conduct involved multiple acts, the reviewing court must determine whether any of the offenses at issue are lesser-included offenses. *Miller*, 238 Ill. 2d at 165. If an offense is a lesser-included offense, multiple convictions are improper. *Id.*

¶ 133     The abstract elements approach is the proper method to determine whether one offense is a lesser-included offense of a greater offense. *Id.* at 174-75. Under this approach, a comparison is made of the elements of the two offenses. *Id.* at 166. "If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *Id.* In other words, in order to be a lesser-included offense, it must be impossible to commit the greater offense without necessarily committing the lesser offense. *Id.*

¶ 134                    2. *This Case*

¶ 135     Defendant argues that "it is both theoretically and practically impossible to commit criminal sexual assault without also committing unlawful restraint." Defendant correctly states that "the use of force to detain the victim in order to effectuate the sexual assault" cannot sustain a

separate conviction for unlawful restraint *where the use of force and restraint are the same conduct*. See *People v. Daniel*, 311 Ill. App. 3d 276, 290, 723 N.E.2d 1279, 1293 (2000)) (unlawful restraint count that charged that defendant "entered [the victim's] vehicle, stated that he had a gun, and sexually assaulted her" was a lesser-included offense of the aggravated criminal sexual assault count).

¶ 136    However, "[u]nlawful restraint is not necessarily a lesser included offense of criminal sexual assault" and "is punishable as a separate crime if the restraint is independent of the other offenses and arose out of separate acts." *People v. Alvarado*, 235 Ill. App. 3d 116, 117, 600 N.E.3d 1236, 1237 (1992). In *Alvarado*, for example, the defendant drove the victim to a secluded area, sexually assaulted her, then drove to his grandfather's house. *Id.* Upon arrival, the victim jumped out of the car and ran to the front door, but the defendant grabbed her and physically prevented her from entering the house. *Id.* The Third District held that convictions for both criminal sexual assault and unlawful restraint were proper because "the convictions were based upon separate, independent acts which were not closely related." *Id.*

¶ 137    The present case is similar to *Alvarado*. Defendant performed several acts of physical force over the course of at least three hours while committing the sexual assaults. B.L.M. testified that defendant choked her, pinned her to the freezer, undressed her, made her lay in the bed, and threatened to kill her. She testified that she tried to push him away and "tried to fight back," implying that defendant was physically overcoming her. These acts of defendant were the acts of force necessary to effectuate the sexual assaults. However, after the acts of sexual penetration concluded, defendant did not let B.L.M. leave his house. Instead, he ordered her into the shower and directed her to clean herself, even instructing her to use soap. This act of detention was not necessary to effectuate the sexual assault, which had already occurred. This detention was

a separate detention, likely intended to destroy evidence of the sexual assault.

¶ 138    Similarly, before B.L.M. could leave defendant's porch, defendant made B.L.M. kiss him so that her departure would be captured on the neighbor's cameras and appear normal. This was another separate and independent act of detention that was not necessary to effectuate the sexual assaults but instead was intended to conceal them.

¶ 139    Under the facts of this case, because defendant's unlawful restraint conviction was based on acts separate and independent from those of the criminal sexual assault convictions, defendant's convictions do not violate the one-act, one-crime doctrine.

¶ 140                                III. CONCLUSION

¶ 141    For the reasons stated, we affirm the judgment of the trial court.

¶ 142    Affirmed.

*People v. Hood*, 2022 IL App (4th) 200260

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 18-CF-148; the Hon. Scott Jones Butler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and Rosario David Escalera Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |