NOTICE
Decision filed 04/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220140-U

NO. 5-22-0140

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-1823 |
| | ) | |
| BRIAN K. FRANCE, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We find that (1) the trial court's finding that the defendant voluntarily consented to a search of his cellphone, without limitations, was not against the manifest weight of the evidence; (2) the defendant's multiple acts of penetration supported multiple convictions of aggravated criminal sexual assault, even though each charge was based on the same type of action in aggravation; (3) the defendant's conviction for unlawful restraint violated the one-act, one-crime rule; and (4) the case must be remanded to the trial court for the defendant to file a motion to correct clerical errors in the mittimus if he so chooses.

¶ 2    The defendant, Brian K. France, was charged by information on June 22, 2018, with 12 counts of aggravated criminal sexual assault in violation of sections 11-1.30(a)(2) and 11-1.30(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.30(a)(2), (a)(3) (West 2016)), two counts of criminal sexual assault in violation of sections 11-1.20(a)(1) and 11-1.20(a)(2) of the Code (*id.* § 11-1.20(a)(1), (a)(2)), one count of unlawful restraint in violation of section 10-3

1

of the Code (*id.* § 10-3), and one count of involuntary manslaughter in violation of section 9-3(a) of the Code (*id.* § 9-3(a)). Prior to trial, the State dismissed six counts of aggravated criminal sexual assault and proceeded on the remaining counts.

¶ 3    A jury trial was conducted on October 8, 2019. The trial proceeded on 10 charges consisting of the following: six counts of aggravated criminal assault, each charged under two aggravating theories, endangering life and bodily harm; two counts of criminal sexual assault, charged under two theories, force and inability to consent; one count of unlawful restraint; and one count of involuntary manslaughter. The jury found the defendant guilty of all charges. On December 9, 2019, the defendant was sentenced, with the trial court merging three counts of aggravated criminal sexual assault and one count of sexual assault. The trial court sentenced the defendant to 20 years' incarceration in the Illinois Department of Corrections for each of the remaining three counts of aggravated criminal sexual assault, 10 years' incarceration for criminal sexual assault, 3 years' incarceration for unlawful restraint, and 5 years' incarceration for involuntary manslaughter.

¶ 4    The defendant now appeals his convictions and sentence, arguing that the trial court should have granted his motion to suppress evidence obtained from the defendant's cellular telephone (cellphone); should have merged the remaining three aggravated criminal sexual assault convictions into one and vacated the conviction for unlawful restraint under the one-act, one-crime rule; and, that remand is necessary to correct an error in the mittimus. For the following reasons, we vacate the defendant's unlawful restraint conviction and direct the trial court to enter a revised mittimus. We otherwise affirm the defendant's convictions and sentence. Pursuant to Illinois Supreme Court Rule 472 (eff. Feb. 1, 2024), however, we remand the issue of clerical error in the

mittimus to the trial court to allow the defendant to file a motion in that court, if he chooses to do so.

¶ 5                                     I. BACKGROUND

¶ 6     On June 14, 2018, at 4:44 p.m., the defendant called 911 to request medical assistance. Responding personnel found the victim deceased on the floorboard of the defendant's truck outside of his home. The victim was the girlfriend of the defendant's stepson, Heath Debardeleben. The defendant advised responding officers that the victim was addicted to heroin and had been using it earlier that day.

¶ 7     The same evening, the defendant was given a courtesy ride to the Troy Police Department for a recorded interview with Detective Michael Raymond. Detective Raymond requested a voluntary statement to determine what had occurred that day prior to emergency responder's arrival. During the interview, the defendant consented to a search of his cellphone and signed a consent to seize and search electronic media. Detective Raymond extracted the data contained on the cellphone and downloaded a copy onto a police-owned computer hard drive. The analysis, performed a few days later, revealed a series of videos and still images which depicted the defendant sexually assaulting the victim in his truck on June 14, 2018, several hours prior to his 911 call. The defendant was subsequently arrested and charged with multiple counts of aggravated sexual assault, sexual assault, unlawful restraint, and manslaughter.

¶ 8                            A. Defendant's Motion to Suppress

¶ 9     On September 30, 2019, the defendant filed a motion to suppress evidence resulting from the search of his cellphone. On October 2, 2019, the parties appeared for a hearing on the motion to suppress evidence.

3

¶ 10    Detective Raymond testified that on June 14, 2018, he was assigned as the lead investigator involving the suspicious death of the victim. Detective Raymond testified that he received information that the victim had died in the defendant's vehicle, which was parked at his residence, and that drugs were involved. He responded to the defendant's residence. An investigation ensued, and Detective Raymond eventually asked the defendant if he would agree to be transported to the Troy Police Department to provide a voluntary statement. Due to the weather, the defendant was asked to sit inside of a police vehicle and agreed. The defendant was seated inside of the police vehicle for approximately 20 minutes, with the windows down and the air conditioning running. He was not told that he was under arrest, he was not placed in handcuffs, and at no point did he request the door be opened. The defendant was transported to the Troy Police Department and placed into one of their interview rooms equipped with audio/video recording capability. People's exhibit 3, an audio/video recording of the defendant's interview on June 14, 2018, was admitted into evidence and published for the trial court.

¶ 11    The recording shows Detective Raymond informing the defendant that he was at the police department because the "young lady at your house is deceased," and that the police were conducting a death investigation. The defendant informed Detective Raymond that he picked up the victim at around 2 p.m. that day and described her demeanor as "kind of silly," and "crazy." In discussing the events leading up to and after the victim's death, the defendant repeatedly referenced the fact that he had been in communication with the victim's mother, Tammy Novotny, by call and text on his cellphone. The defendant also referenced receiving a call from the victim, who used Heath's phone, asking the defendant to pick her up.

¶ 12    Detective Raymond subsequently asked the defendant "do you mind if we do a forensic analysis on your phone and we can show the communication between you and her mom?" The

4

defendant responded, "I'll show you right now." Detective Raymond then stated "well we can ***

we hook it up to a machine to make it a little bit more formal for us. Are you ok with that?" The

defendant responded, "if you bring me the phone, I will show you." The defendant indicated that

he would show Detective Raymond the communications he had with Tammy Novotny while also

stating, "I'll show you it all." Detective Raymond retrieved the defendant's cellphone, and the

defendant began accessing his cellphone while Detective Raymond spoke. Detective Raymond

began to discuss performing a forensic analysis on the defendant's cellphone; however, the

defendant interjected by leaning forward and showing Detective Raymond messages between the

defendant and victim's mother, Tammy. Detective Raymond then asked the defendant if he would

mind if Detective Raymond held his cellphone and looked at it; the defendant did not verbally

respond and continued to read messages, eventually handing the detective his cellphone.

¶ 13    Subsequently, Detective Raymond asked the defendant if he minded "if I just kind of skim

through real quick?" The defendant responded, "you can look at Tammy until you're blue in the

face." Detective Raymond asked the defendant if he minded if he went to "hook this up to our

cellphone machine and start that way—I can pull this all off and I read it a little bit better on one

page?" The defendant responded, "that's fine." At that point Detective Raymond moved a consent

form toward the defendant and stated, "so this is a consent so if you can sign right here for me,

today's date, and I'll give you the time." While the defendant was signing the form, Detective

Raymond asked if the defendant had a passcode on his cellphone and the defendant said "no, just

leave it like that and you can have the whole thing." Upon his return to the interview room,

Detective Raymond sat down and informed the defendant, "your phone is taking a little longer to

get looked at—there's pictures or something on it—so, um, it's gonna have a couple more

minutes."

¶ 14    After the recording was published, the State admitted a copy of the Troy Police Department's consent form that the defendant signed prior to the search of his cellphone. Detective Raymond testified that he explained to the defendant that performing a forensic phone analysis allowed police "to put all the information in a more chronological order" and made it "easier to read and evaluate." Detective Raymond testified that the defendant signed the consent form and did not ask any additional questions about it. There was no indication that the defendant could not read the form. Detective Raymond testified that the consent form detailed, specifically, the information that would be derived from the search of the cellphone.

¶ 15    In its ruling, the trial court noted that it was the defendant who brought up the fact that there was relevant information on his cellphone and that "the defendant, says if you bring me my phone I'll show you where I talk to her." The trial court considered that upon receiving his cellphone, the defendant was "holding the phone and looking for the text messages. And he [was] turning the phone so that the officer [could] see the phone." The trial court also referenced the defendant's response to Detective Raymond's question asking if he minded if Detective Raymond "load[ed] this up on our forensic machine" to read it better and "the defendant says not at all." The trial court further noted, "He then goes on to say you can look at it until you're blue in the face. And ultimately he does say you can have the whole thing, in relation to the phone." In discussing the consent form, the trial court stated, "that the consent in the Court's eyes needs to be a voluntary consent. And that's what's required. It isn't necessarily required that there be a written consent by the defendant." The trial court indicated that the consent "simply has to be a voluntary consent" which was clear based on the discussion. The trial court stated:

> "The defendant offers up his phone, offers to show him, offers to let him have it, tells him
>
> he can see it until he is blue in the face. It has to be voluntary. But the knowing part of the

6

consent aspect of it, it's not required that the officer read that entire consent form. I think the officer was being careful by getting the written consent form from the defendant."

The trial court ultimately found that the defendant had "voluntarily consented to his phone being dumped," and denied the motion to suppress evidence.

¶ 16                                    B. Jury Trial

¶ 17    The defendant's case proceeded to trial on October 7, 2019. The State called Officer Justin Christ, who was employed as a patrol officer with the Troy Police Department. Officer Christ testified that on June 14, 2018, he responded to an emergency call from the defendant at approximately 4:44 p.m. Dispatch had advised that there was an unconscious female, she was not breathing, and that she had been coughing up blood. Officer Christ and another patrol officer responded to the address in less than five minutes. When they pulled up to the house, Officer Christ saw the defendant on the phone with 911 by a pickup truck with the door open. When approaching the vehicle, the defendant pointed to a female inside of the truck, and Officer Christ began performing lifesaving efforts. The defendant informed the officers that the victim was a heroin addict and had potentially used heroin that day. Officer Christ retrieved naloxone from his car and administered the same to the victim, with no response. Officer Christ did not believe the naloxone would be effective, because, in his opinion, she had been deceased for some time. Officer Christ testified that he based his opinion on the victim not having a pulse, the dried blood on the side of her cheek from her mouth and nostrils, and she did not appear to have any rise and fall of her chest to indicate she was breathing.

¶ 18    Officer Christ began speaking with the defendant, who indicated that he had responded to an address to pick up the victim based on a disturbance with her boyfriend, Heath. The defendant picked the victim up and returned home, where he began doing yard work. The defendant stated

7

that the victim had been sleeping in the truck for approximately two hours, and when he went to the truck to check on her, he noticed she had blood on her cheek. The defendant stated that he was nervous, but other than that, seemed relatively emotionless.

¶ 19    Tammy Novotny testified that she was the victim's mother. Her daughter lived with Heath Debardeleben, who was the father of the victim's two daughters. The defendant is Heath's stepfather. Tammy testified that her daughter was addicted to heroin.

¶ 20    On June 14, 2018, the victim told Tammy that she wanted to come to Tammy's house. At 10:37 a.m. that morning, the victim said she would be right over, which was the last time Tammy heard from her daughter. Earlier, around 10 a.m., the defendant had stopped by Tammy's house to see if the victim was there. After learning that she was not, he talked with Tammy for a while, informing her that he was going to go check on the victim at her house because she had a seizure the night before and Heath was upset. Tammy called the defendant around noon and the defendant said that he and the victim were at Columbia Park in Collinsville, Illinois. Tammy told the defendant that he and the victim should not be in the heat. The defendant told Tammy there was a nice breeze, that he had the door open on his side, and the window was down. At around 2 p.m., Tammy spoke with the defendant again and he told her that the victim was bleeding out of her mouth and asked what he should do. Tammy advised the defendant that he should call 911 or take the victim to the hospital. When she spoke with the defendant again, he told her that the victim was deceased.

¶ 21    Heath Debardeleben testified next. He stated that he had known the victim since the fourth grade, that they had been in a relationship for 11 years, and shared two children. Heath testified that the relationship at times became physical, and that the physical violence went both ways. Heath described the defendant's relationship with the victim as the defendant being an enabler.

8

Heath testified that on June 14, 2018, he stayed home from work because the victim said she had nowhere to go, and Heath did not think that he could trust her at his house.

¶ 22    The defendant came over around noon. He sat down in the kitchen and Heath went to the garage for a few minutes. When he came back, he found the victim in the closet with a needle near her on the floor and he could tell she had just shot up. Heath testified that the victim was out of it. Heath grabbed his cellphone and videotaped her to show her later the state she was in after using drugs. Heath did not want the victim around him or his children when using drugs. Heath carried the victim to the defendant's truck. He testified that the victim fell out of the truck and the defendant placed her back in the truck. Heath told the defendant "[s]he needs help," and the defendant responded, "I'm going to get her help." The two left together and Heath never heard from the victim again. Heath provided the drug paraphernalia that the victim had used that morning to the police as a part of their investigation.

¶ 23    Detective Raymond testified that on June 14, 2018, he responded to the call of a suspicious death while working for the Troy Police Department. Detective Raymond was the lead detective for the case and arrived on scene at approximately 5:35 p.m. He testified that he wanted to establish a timeline with the defendant, as he was the last person to see the victim alive. The defendant was given a courtesy transport to the Troy Police Department and placed in an interview room. The defendant stated that he had picked the victim up from her residence and transported her to his home at which point he did yard work while she slept in his vehicle. When he went to check on her, he noticed that she was not breathing and contacted her mother and then called 911. The defendant established a timeline of the day, being that the defendant picked the victim up from her residence after communications via text with Tammy. There was text messaging communication throughout the day, and it was approximately four hours from the time the defendant picked the

9

victim up to the time the defendant called 911. The defendant told Detective Raymond that he noticed the victim was not breathing, had blood coming from her mouth, and that he had attempted cardiopulmonary resuscitation (CPR). The defendant indicated that the victim had been breathing 5 to 10 minutes before he noticed that her breathing had stopped.

¶ 24    Detective Raymond testified that he asked for more information about the text messages with Tammy in order to establish a timeline. Detective Raymond testified that the best practice to get the text messages off of the defendant's cellphone would be to do a forensic analysis of the cellphone and extract the data from the same in its raw format. Detective Raymond explained that the data would include time stamps and dates of the messages, which would be more accurate than a screenshot of the messages on the cellphone. Detective Raymond testified that after the defendant mentioned the text messages, Detective Raymond asked if he could complete the forensic analysis on the cellphone. He explained that a forensic analysis means that he would plug the defendant's cellphone into a machine called Secure View, and the machine would extract all of the data from the cellphone including calls, texts, photos, and videos and place it into a format that is readable by the investigator. Detective Raymond requested to complete the forensic analysis, and the defendant completed a consent to search form for his device. Detective Raymond then extracted the data and returned the defendant's cellphone to him. Detective Raymond concluded the interview with the defendant on that day and the defendant left with his cellphone.

¶ 25    Detective Raymond reviewed the data extracted from the defendant's cellphone a few days later. He found multiple concerning still and video images depicting sexual acts that had occurred on June 14, 2018, that were inconsistent with the defendant's timeline of events on that day. The time and date stamps of the videos imbedded in the cellphone indicated that the victim and the defendant had sexual relations on the day of her death. The State introduced and published People's

10

exhibit 40, which was a PowerPoint presentation prepared by Detective Raymond aggregating the images and videos that were in the data extracted from the defendant's cellphone.

¶ 26 Based on the depictions in the photographs and videos, Detective Raymond asked the defendant to come to the station for a second interview on June 21, 2018. The second interview was approximately three hours long. Detective Raymond testified that in the first hour of the interview, the defendant relayed the same information about the events of June 14, 2018, as in the first interview. Detective Raymond then confronted the defendant with the images and videos found of him and the victim on the day that she had died. The defendant admitted to having a sexual relationship with the victim and hiding it from his son, Heath, and the victim's mother, Tammy.

¶ 27 The State introduced photographic exhibits showing the defendant digitally penetrating the victim's vagina, holding the victim's hand onto his penis, the defendant pinching the victim's nipple, and the victim located on the floorboard of the defendant's vehicle. The last picture being the position the victim was found in by police after the defendant called 911. The State also published videos for the jury of the defendant sexually assaulting the victim.

¶ 28 Dr. Kamal Sabharwal testified that he was employed as a forensic pathologist for approximately 14 years and was qualified as an expert in the field of forensic pathology. Dr. Sabharwal conducted the autopsy of the victim and noted that she had abrasions on her forehead, both cheeks, and her lip. The victim had multiple bruises on her lower lip, her arms, both legs, her right abdomen, and her hip area. The victim had a tear on her lip that looked like a fresh injury. There was fentanyl and methamphetamine present in the victim's blood. Dr. Sabharwal testified that, with only this information, the cause of death would have been determined to have been a drug overdose.

11

¶ 29    Dr. Sabharwal, however, had an opportunity to view the videos taken of the victim on the day of her death. Heath took a video of the defendant in the morning shortly after he believed she had taken drugs. The video showed the victim's mannerisms, including flailing arms that indicated she was under the influence of some type of drug and also could have explained some of the bruising on her body.

¶ 30    Dr. Sabharwal also observed the videos taken from the defendant's cellphone. Dr. Sabharwal testified that in one of the videos, there was a struggle between the defendant and the victim. The victim was lying on the floorboard of the vehicle, restrained by the defendant's legs, and was being sexually assaulted. Dr. Sabharwal observed the victim struggling and screaming. The victim was restrained in the floorboard in a position with her head and neck tilted towards her chest until she became unresponsive and stayed in that position. Dr. Sabharwal found the video important, as it helped to explain the victim's elevated body temperature. Both drug use and being involved in a struggle can cause elevated body temperature, as well as being confined to a small area. Dr. Sabharwal opined that the victim's body position was important because it would have been difficult for her to adequately breathe and get the oxygen that she needed. The doctor testified that the video showed the victim exhibiting agonal breathing, which is an irregular breathing pattern where someone is struggling to get the oxygen they need. Dr. Sabharwal opined that the position the victim's body was being restrained in was one of the things that would impair her ability to get and utilize the amount of oxygen that she needs. In the victim's case, the defendant was engaging in sexual conduct while restraining the victim on the floorboard with her buttocks over the hump in the vehicle's floorboard and her head against the door sill. The victim was struggling against the defendant's restraint, kicking her legs, and screaming. The defendant had an elevated body temperature due to the drugs in her system, the struggle against the defendant's

12

restraint, and confinement to a small area in the vehicle. The victim finally became unresponsive in that position with her head tilted towards her chest. In the expert's opinion, she became unresponsive due to exhaustion from the struggle in combination with the drugs in her system and was unable to get out of the position that caused her to be unable to breathe. Thus, Dr. Sabharwal found that the victim's cause of death was asphyxia due to position following restraint in an individual intoxicated with fentanyl and methamphetamine.

¶ 31    The State rested and the defendant moved for a directed verdict, which was denied. The defendant called two witnesses that testified relating to the victim suffering a seizure the night prior to her death and the forensic evidence taken from scrapings under the victim's fingernails not matching the defendant. The defendant did not testify, and both parties rested their case. The jury found the defendant guilty of all charges.

¶ 32                                    C. Posttrial

¶ 33    The defendant filed a motion for new trial on October 21, 2019. The defendant argued that the trial court committed reversible error by denying the defendant's motion to suppress the evidence obtained after the search of the defendant's cellphone and that the convictions violated the one-act, one-crime doctrine. The motion for new trial was denied.

¶ 34    The defendant's sentencing hearing was held on December 9, 2019. At the hearing, the parties disagreed on how many separate convictions and sentences were warranted pursuant to the one-act, one-crime rule. The State conceded that each of the "force" based, and "consent" based sexual assault charges should be merged, but argued against applying the rule any further. The trial court agreed and imposed consecutive terms of imprisonment on four of the eight sexual assault charges; counts II, VI, X, and XIII of the information. The defendant was sentenced to three 20-year sentences for the aggravated sexual assault counts and one 10-year sentence for the criminal

sexual assault count. Additionally, the trial court ordered a five-year sentence for involuntary manslaughter and a three-year sentence for unlawful restraint, which would be served concurrent to each other but consecutive to the sentences previously handed down. The defendant's aggregate sentence was 75 years' imprisonment.

¶ 35    The defendant filed a motion for a new trial alleging, *inter alia*, that the trial court erred in denying his motion to suppress the evidence seized from his cellphone. The defendant also filed a motion to reconsider his sentence, alleging that the sentence imposed was excessive and violated the one-act, one-crime rule, which was denied following a hearing on March 8, 2022. This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, the defendant raises four issues for this court's consideration: (1) that the trial court erred in denying the defendant's motion to suppress evidence; (2) that the one-act, one-crime doctrine requires two of the defendant's aggravated criminal sexual assault convictions to be vacated; (3) that the one-act, one-crime doctrine requires the defendant's conviction for unlawful restraint to be vacated; and (4) that remand is necessary to correct a clerical error in the mittimus. We will address the defendant's alleged errors in the order raised.

¶ 38                              A. Motion to Suppress

¶ 39    The first issue the defendant raises on appeal is whether the trial court erred by denying the defendant's motion to suppress evidence obtained from a search of his cellphone. The defendant argues that the forensic cellphone analysis conducted by Detective Raymond exceeded the scope of his voluntary consent by downloading and searching the entire contents of the cellphone which resulted in Detective Raymond discovering the incriminating photographs and videos of the defendant and the crimes he committed against the victim on the day she died. The State argues

14

that the defendant consented to Detective Raymond's search of the cellphone and that Detective Raymond's resulting search did not exceed the scope of the defendant's consent.

¶ 40     We review an order denying a motion to suppress under a two-part standard of review. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). Under this standard, the trial court's factual findings and credibility determinations are given great deference and will be rejected only if against the manifest weight of the evidence. *Id.* We review *de novo* the trial court's ultimate ruling as to whether suppression was warranted. *Id.*

¶ 41     The defendant argues that the presence of a video recording of the defendant's interview leads to this court's review being *de novo*. The State presented live testimony, however, both during the motion hearing and at trial regarding the circumstances surrounding the defendant's consent to search his cellphone. Further, the trial court made determinations of fact that, by the defendant's own admission, were subject to multiple interpretations based on review of the video. Therefore, we will apply the manifest weight standard to the trial court's findings of fact and credibility determinations, unless discrepancies between the video and the testimony are clearly shown. See *People v. Firestine*, 2019 IL App (5th) 180264, ¶ 15 (discrepancies between the video and the testimony about it must be resolved in favor of what the video shows); *People v. Hadden*, 2015 IL App (4th) 140226, ¶¶ 26-29 (declining to conduct a *de novo* review even though the evidence at trial consisted solely of audio recordings; explaining that spoken language contains paralanguage—vocalizations that are not actual words—that may be subject to differing interpretations, and, therefore, the reviewing court must defer to the trial court's findings based on the audio recordings).

¶ 42     The defendant brings his challenge of the evidence under both the United States and Illinois Constitutions. Both the United States and the Illinois Constitutions govern the conduct of police

15

officers in performing warrantless searches and prohibit unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6; *People v. Buss*, 187 Ill. 2d 144, 204 (1999). It is well settled under the fourth and fourteenth amendments of the United States Constitution that warrantless searches are unreasonable subject to only a few established exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). One established exception to the warrant requirement is a search that is conducted by consent. *Id.* It is the State's burden to show by a preponderance of the evidence that consent was voluntary. *People v. Alvarado*, 268 Ill. App. 3d 459, 464 (1994). Voluntariness of consent to search is a question of fact to be determined from the totality of the circumstances, and the trial court's finding that consent to search was voluntary will be reversed only if it is against the manifest weight of the evidence. *Schneckloth*, 412 U.S. at 227; *People v. Martin*, 102 Ill. 2d 412, 426 (1984).

¶ 43    In the present case, the defendant concedes that he voluntarily consented to a search of his cellphone; however, he argues that his voluntary consent was limited to the text message conversation between himself and Tammy. The defendant argues that Detective Raymond's download and search of the entire contents of the defendant's cellphone, days after his interview at the police station, exceeded the scope of his voluntary consent. Thus, the disputed issue is what the defendant consented to in terms of the search.

¶ 44    Generally, when the police rely upon consent as the basis for a warrantless search, they have no more authority than they have been given by the voluntary consent of the defendant. *People v. Berry*, 314 Ill. App. 3d 1, 11-12 (2000). The scope of their authority is not determined based on the subjective intentions of the consenting party nor the subjective interpretation of the searching officer. *People v. Baltazar*, 295 Ill. App. 3d 146, 149 (1998). The standard for determining if a police officer acted within the scope of a suspect's consent under the fourth

16

amendment is "objective reasonableness," which requires consideration of what a "typical reasonable person [would] have understood by the exchange between the officer and the suspect." (Internal quotation marks omitted.) *Berry*, 314 Ill. App. 3d at 12. In analyzing the issue of the scope of the defendant's consent, we must examine the stated objective of the police officer's request to search that led to the consent given and whether the officer informed the suspect of the reasonable parameters of his inquiry. *Baltazar*, 295 Ill. App. 3d at 150. By stating the intended object of the search, either directly or by revealing a suspicion of specific criminal activity, a police officer not only apprises the suspect that his constitutional rights are being impacted, but he also informs the suspect of the reasonable parameters of his inquiry. *Id.*

¶ 45 The court in *Berry*, 314 Ill. App. 3d at 11-12, addressed the scope of consent with respect to electronic devices, specifically, a cellphone. Relying on various federal cases, the *Berry* court stated that the lack of knowledge of what the officer is searching for does not change the effect of a "general" consent. *Id.* at 12. If a consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search would be limited, and the consent would include consent to search the memory of electronic devices. *Id.* The *Berry* court then considered the totality of the circumstances, which involved the detective asking to look at the defendant's cellphone and the defendant responding " 'go right ahead.' " *Id.* The defendant knew when the detective asked to search the cellphone that he was investigating a murder and that he was trying to determine whether the defendant owned the cellphone. The defendant placed no explicit limitations on the scope of the search, either when he gave his general consent or while the officer examined the phone. *Id.* at 14. Therefore, the court determined that, based on the totality of the circumstances, the detective did not exceed the scope of the defendant's general consent to search his cellphone when the detective activated the cellphone and retrieved the cellphone number. *Id.*

17

¶ 46    In *People v. Prinzing*, 389 Ill. App. 3d 923 (2009), on which the defendant here relies, the court determined that the detective, by his own words, limited the scope of a computer search when he requested to search the defendant's computer for viruses or key-logging programs to determine if the defendant's credit card number had been stolen. The defendant consented to a search only for viruses, not images, and thus, the court found that the detective's search of photographs exceeded the scope of the defendant's consent.

¶ 47    The search in the instant case requires us to look to the totality of the circumstances surrounding the exchange between the defendant and Detective Raymond to determine whether a typical reasonable person would have believed that the scope of the defendant's consent included permission for the officer to search the photographs and videos contained within the defendant's cellphone. The evidence regarding the conversation between the defendant and Detective Raymond is disputed by the parties, although the defendant does not argue that his consent was obtained through coercion.

¶ 48    The defendant voluntarily accompanied officers to the police department to be interviewed regarding the victim's death. During the resulting interview, the defendant repeatedly brought up evidence that would be on his cellphone, including calls with Tammy prior to and during the events leading to the victim's death, the 911 call he made, and that the victim had previously called him from Heath's cellphone earlier that day.

¶ 49    The defendant argues that Detective Raymond limited the scope of the search when he asked, "So speaking of your cell phone, since you talked to her mom, one thing we'd like to do— do you mind if we do a forensic analysis on your phone so you can show the messages between you and her mom?" The defendant answered, "I will show you right now." Detective Raymond explained that the police had a machine that would "make it a little more formal for us. Are you

18

ok with that?" The defendant responded that if he had his cellphone, he would show Detective Raymond. Detective Raymond responded that he would retrieve the cellphone and "that piece of paper, so I can get your consent on it." Once Detective Raymond retrieved the defendant's cellphone, the defendant opened the cellphone to his text messages and showed Detective Raymond the text conversation between the defendant and Tammy, allowing Detective Raymond to hold the cellphone and scroll through the messages himself. Detective Raymond asked, "Do you mind if I go upload this into our cell phone machine, so that way I can pull this off? I can read it a little better on one page." The defendant said, "That's fine. I don't have a problem with you doing what you need to." Thus, according to the defendant, Detective Raymond, by his own words, limited the scope of the search to only the text conversation between the defendant and Tammy.

¶ 50    In the trial court, the State argued that while the defendant stated that he would show Detective Raymond the communications he had with Tammy, he also stated: "I'll show you it all." Once in the room with the defendant and his cellphone, Detective Raymond began to discuss performing a forensic analysis on the defendant's cellphone; however, the defendant interrupted him, leaning forward and showing Detective Raymond messages from Tammy on his cellphone. Detective Raymond asked the defendant if he would mind if Detective Raymond held his cellphone and looked at it. The defendant continued to read messages, eventually handing Detective Raymond the cellphone. Detective Raymond subsequently asked the defendant, "do you mind if I just kind of skim through real quick?" and the defendant responded, "you can look at *Tammy* until you're blue in the face." (Emphasis added.) Detective Raymond subsequently asked the defendant, "ok do you mind if I go hook this up to our cell phone machine and start that way— I can pull this all off and read it a little bit better on one page?" and the defendant responded, "that's fine."

19

¶ 51 Detective Raymond then moved the police department's consent to search form toward the defendant and stated "so this is a consent, so if you can sign right here for me, today's date, and I'll give you the time." While the defendant was signing the form, Detective Raymond asked the defendant if he had a "passcode" on his cellphone and the defendant stated "no, just leave it like that and *you can have the whole thing*." (Emphasis added.) Upon his return to the interview room, Detective Raymond sat down and informed the defendant "your phone is taking a little longer to get looked at—there's pictures or something on it—so um its gonna have a couple more minutes."

¶ 52 Both parties agreed that the defendant signed the consent form, although the defendant argues that he did not read it. The consent form detailed with specificity the information that would be derived from the search. It was contained on less than one page and explained that the defendant was authorizing a complete search of his electronic media device, all digital media or SIM cards associated with the cellphone for purposes of further analysis, and a complete search of any and all information obtained or derived from the search. The form explicitly mentioned that it would include, *inter alia*, pictures, videos, and text messages. The form indicated that the Troy Police Department would remove and retain custody over and search any property in connection with the copying or searching of the defendant's cellphone. The form included an affirmation that the defendant fully understood that he had the right to refuse his consent and to withdraw his consent at any time.

¶ 53 The trial court found that the defendant said, "you can look at *it* until you're blue in the face" (emphasis added), and ultimately said "you can have the whole thing," in relation to the cellphone. While the trial court found that the defendant said, "You can look at 'it' until you're blue in the face," apparently construing "it" to mean the cellphone; the defendant argues, and we

20

agree based on our independent review of the video recording of the defendant's interview, that the defendant stated "you can look at 'Tammy' until you are blue in the face."

¶ 54    The defendant concedes, however, that the meaning of the second phrase—when the defendant stated that Detective Raymond could "have the whole thing"—was more ambiguous. The defendant argues that, based on the context surrounding the statement, the "most plausible interpretation" was that the defendant meant the conversation with Tammy, or the physical cellphone itself, but only if the cellphone was left open to the screen the detective was already viewing.

¶ 55    The trial court resolved this conflict in favor of the State. A reviewing court must give due weight to the inferences drawn by the finder of fact. *People v. Wear*, 229 Ill. 2d 545, 561 (2008). As the defendant points out in his opening brief, the statement could be open to multiple reasonable interpretations based on the surrounding context, arguing that the defendant was limiting his consent to the text conversation with Tammy. The trial court's interpretation, however, was that the defendant was giving voluntary consent to search the entire cellphone. We cannot find that the opposite conclusion was clearly evident or that the finding was unreasonable, arbitrary, or not based on the evidence presented. See *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Even under a *de novo* review, we would reach the same conclusion. Especially whereas here, the defendant signed a general consent to search the entire cellphone before Detective Raymond left the room. The consent form must be considered when looking at the circumstances surrounding the making of the statement to determine its meaning.

¶ 56    The trial court found that the State had proven by a preponderance of the evidence that the defendant gave his voluntary consent for Detective Raymond to search the entire cellphone when it denied the defendant's motion to suppress. The defendant argues that we should give the consent

21

form little weight, as did the trial court. We may, however, affirm the trial court's ruling on any basis apparent in the record, regardless of the reasoning relied on by the trial court. *People v. Burchell*, 2018 IL App (5th) 170079, ¶ 9. The trial court acknowledged the signed consent form and the defendant's signature thereon, finding that it was not necessary to a finding of voluntary consent, but was evidence of the detective "being careful." Regardless of how much weight the trial court ultimately gave the consent form, we find it to be highly relevant to the determination of what a reasonable person would have understood the police had been granted authority to search based on the exchange between the officer and the defendant.

¶ 57     The defendant was aware that Detective Raymond's objective in speaking with him was to determine the timeline of events leading to the victim's death, and ultimately, her cause of death. The defendant was the last person to see the victim alive, and in an apparent attempt to help Detective Raymond create a timeline of the defendant and the victim's activities that day, the defendant told Detective Raymond about evidence contained on his cellphone. The evidence on the defendant's cellphone, according to the defendant's statements, would indicate that the victim called the defendant; that the defendant noted the victim's odd behavior and informed Tammy; that the defendant told Tammy he and the victim were at the park; and that the defendant called 911. Each of these facts would be supported by evidence contained in the defendant's cellphone and would include the times that each event occurred. After the defendant discussed the evidence that would be contained on his cellphone, Detective Raymond began to ask the defendant to conduct a forensic analysis of the same. The defendant showed the text conversation to the detective willingly. Prior to downloading the contents of the cellphone, Detective Raymond asked the defendant to sign the consent to search form, which he did. The consent form was explicit and clear about scope of the consent to search his cellphone. The form did not reflect any specific

limitations, and by all objective measures was a general consent to search the cellphone. That distinguishes this case from *Prinzing*, where the police officer at issue, "by his own words, limited the scope of the intended computer search," by limiting the items he was searching for to computer viruses that could have led to the defendant being a victim of credit card fraud. *Prinzing*, 389 Ill. App. 3d at 936.

¶ 58 While the fact that a written consent form was signed is not dispositive when circumstances show that the signature was obtained by coercion (*People v. Cardenes*, 237 Ill. App. 3d 584, 588 (1992)), the defendant does not argue and we find no evidence of coercion here. While the defendant argues that the consent form was not explained to him and that he did not read it, he was given ample opportunity to do so. The government need not establish "an intentional relinquishment or abandonment of a known right or privilege" in order for a defendant's consent to search to be valid. (Internal quotation marks omitted.) *Schneckloth*, 412 U.S. at 235, 243. The defendant's argument that he did not read the written consent form before signing it does not render his consent invalid, where the defendant was in a position to do so and there was no evidence that he was prevented from doing so. See *United States v. Roberson*, 573 F. Supp. 3d 209, 231 (D.D.C. 2021) (cited for persuasive purposes only).

¶ 59 While the defendant argues that he normally wears glasses, and did not have his glasses with him during the interrogation, thus preventing him from reading the form, the defendant was able to navigate his cellphone and read the text messages therein to Detective Raymond. The defendant never argued or complained that he could not read the consent form during his interview or in the trial court, although his lack of glasses was mentioned briefly in the trial court. Further, despite the defendant's argument on appeal that the information explaining a forensic analysis and what the defendant was agreeing to along with his rights were "mentioned in the fine print" of the

23

consent form, the record is clear that there was no "fine print" contained in the form. The consent form was a one-page document that anyone with an average level of intelligence, including the defendant as a college educated adult, could read and understand in less than one minute.

¶ 60    The trial court found that the defendant voluntarily consented to the search of his cellphone with no limitations. Based on the totality of the circumstances, including the signed consent form, we cannot say that the trial court's finding that an objectively reasonable person would understand the defendant's exchange with Detective Raymond to impart general consent to search his cellphone without limitations was against the manifest weight of the evidence. As such, Detective Raymond did not exceed the scope of the consent to search, and we affirm the trial court's denial of the defendant's motion to suppress.

¶ 61                    B. One-Act, One-Crime Doctrine

¶ 62    The defendant next argues that this court should vacate two of the defendant's three convictions for aggravated criminal sexual assault and vacate his conviction for unlawful restraint. In support, the defendant argues that the defendant's convictions for aggravated criminal sexual assault were carved from the same physical act. Alternatively, the defendant argues that two of the defendant's convictions for aggravated criminal sexual assault should be reduced to criminal sexual assault because the offenses were based on the same aggravating circumstances. Further, the defendant argues that the defendant's conviction for unlawful restraint should be vacated because it was inherent to the act of sexual assault.

¶ 63                        1. *Same Physical Act*

¶ 64    Pursuant to the one-act, one-crime doctrine a defendant cannot be convicted of multiple offenses "carved from the same physical act," where the "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977).

24

To determine whether multiple convictions may properly be entered, courts must engage in a two-step analysis. First, the court must determine whether the defendant's conduct consisted of separate acts or a single physical act. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). If the court determines that the defendant committed multiple acts, the court then goes on to determine whether any of the offenses are a lesser-included offense. *Id.* If so, multiple convictions are improper; if not, then multiple convictions may be entered. *Id.* Whether a conviction should be vacated under the one-act, one crime doctrine is a question of law which this court reviews *de novo*. *In re Angel P*., 2014 IL App (1st) 121749, ¶ 63. Here, the defendant only challenges whether the three acts of criminal sexual assault were "carved from the same physical act." Therefore, this court need only consider the first step of the one-act, one-crime analysis.

¶ 65    It is well established that multiple convictions are permitted when a defendant has committed several acts, despite the interrelationship of those acts. *King*, 66 Ill. 2d at 566; *People v. Smith*, 246 Ill. App. 3d 647, 652 (1993). Therefore, a defendant may be prosecuted for more than one criminal act that arises from the same episode or transaction, so long as the charges do not arise from the same physical act. *People v. Segara*, 126 Ill. 2d 70, 77 (1988). In the instance of offenses involving sexual assault, a defendant may be convicted on each act of penetration. See *People v. Bishop*, 218 Ill. 2d 232, 247 (2006). Therefore, the one-act, one-crime doctrine does not apply when the charging instrument and the evidence have established that the defendant committed multiple acts of sexual penetration. *Id.*; see also *People v. Olivieri*, 334 Ill. App. 3d 311 (2002) (affirming conviction for three counts of aggravated criminal sexual assault where the charging instrument, evidence presented at trial, and the State's opening and closing arguments clearly referenced three separate sexual acts); *People v. Witherspoon*, 379 Ill. App. 3d 298, 305-06 (2008) (affirming conviction for two offenses of attempt aggravated criminal sexual assault

25

where the State treated the acts as separate during trial); *People v. Myers*, 85 Ill. 2d 281, 289 (1981) ("Two separate invasions of [the victim's] body, even though closely related by reason of the fact that they attacked the same area of his body and were close in time, were not one physical act."); *People v. Bell*, 217 Ill. App. 3d 985, 1012-13 (1991) (upholding the defendant's multiple convictions of aggravated sexual assault where the defendant committed separate acts of sexual penetration).

¶ 66    In this case, the defendant was convicted of three counts of aggravated criminal sexual assault, and the trial court sentenced the defendant for aggravated criminal sexual assault on counts II, VI, and X of the information. Count II of the information charged that the defendant committed an act of sexual penetration upon the victim in that he inserted his finger into the sex organ of the victim by use of force, and said defendant acted in a manner that threatened or endangered the life of the victim. Counts VI and X were similarly charged. Each count was charged in violation of section 11-1.30(a)(3) of the Code (720 ILCS 5/11-1.30(a)(3) (West 2020)).

¶ 67    At trial, the State published the video in People's exhibit 41(c) which captured the first act of aggravated criminal sexual assault, which occurred at 1:36:04 p.m. In the video, the defendant's left hand digitally penetrated the victim's vagina while she struggled against the defendant and screamed, including kicking her legs and flailing her arms. The second act was shown in the group of photographs in People's exhibit 42(f), which occurred at 1:45:44 p.m. and depicted the defendant using his left hand to digitally penetrate the victim's vagina. Finally, the third act was shown in the video contained in People's exhibit 41(m), which occurred at 1:46:30 p.m., and captured the defendant using his left index finger and thumb to digitally penetrate the victim's vagina. During closing arguments, the State referenced the time frame of, and exhibit containing, when each separate act of aggravated criminal sexual assault occurred. The acts were each

26

recorded in different ways: the defendant taking the time to video record his first act of penetration, switching to taking a still photographs of his second act, and returning to videotaping his third act.

¶ 68    We conclude that the one-act, one-crime doctrine was not violated here. The evidence demonstrated that the defendant committed multiple acts of sexual penetration upon the victim as defined by *King*. See *King*, 66 Ill. 2d at 566.

¶ 69                          2. *Common Aggravating Factor*

¶ 70    The defendant argues, in the alternative, that this court should reduce two of the defendant's convictions for aggravated criminal sexual assault to criminal sexual assault, where the one-act, one-crime rule prohibits convicting a defendant for multiple counts of an aggravated offense based on the same aggravating circumstance. An examination of the facts of the instant case reveals that the defendant committed three separate and distinct acts of sexual penetration upon the victim while there existed a common aggravating factor—endangering her life.

¶ 71    We determined above that the defendant's conduct consisted of multiple acts of sexual assault. The defendant's argument is that even if there were three separate acts of penetration, the aggravating factor of endangering the victim's life was an act common to both offenses. For purposes of this analysis, an "act" is "any overt or outward manifestation which will support a different offense." (Internal quotation marks omitted.) *People v. Smith*, 2019 IL 123901, ¶ 18. The defendant argues that there is no evidence that the defendant endangered the victim's life more than once, or in more than one way, such that multiple convictions could stand.

¶ 72    In support of his argument the defendant cites *Bishop*, 218 Ill. 2d at 248-49, and *People v. Cook*, 2011 IL App (4th) 090875, ¶ 35, for the proposition that a defendant may not be convicted for multiple counts of an aggravated offense based on the same aggravating circumstance. Neither *Bishop* nor *Cook* supports the defendant's argument.

27

¶ 73    In *Bishop*, the supreme court vacated one of the defendant's convictions for aggravated criminal sexual assault where the shared aggravating factor was that the victim became pregnant. *Bishop*, 218 Ill. 2d at 248-49. The court noted that only one of the counts of aggravated criminal sexual assault could have been the cause of one pregnancy; that the victim could not have become pregnant more than once. *Id.* Thus, the court accepted the State's concession that the pregnancy could be the aggravating factor in only one conviction. *Id.* In *Cook*, the defendant committed a single act of driving under the influence of alcohol and drugs, and a single death resulted from the ensuing accident. *Cook*, 2011 IL App (4th) 090875, ¶ 36. Both cases are distinguishable. While in each of these cases it was impossible for the harm suffered to be applied to multiple convictions, *i.e.*, pregnancy or death, as the harm could have occurred only once, the same does not follow for the behavior of the defendant over the course of multiple sexual assaults, where the defendant's acts of restraint and confinement of the victim endangered her life.

¶ 74    In the present case the defendant was charged with aggravated criminal sexual assault where he committed criminal sexual assault and, during commission of the assault, an aggravating factor exists. To be considered an aggravating factor, the aggravating circumstance must occur at the time of the commission of the offense or so close to its occurrence that the defendant's actions are an inseparable part of the offense. *People v. Singleton*, 217 Ill. App. 3d 675, 687 (1991).

¶ 75    The State's evidence was that the victim's death was brought about by the defendant when, knowing that the victim had consumed drugs, the defendant restrained the victim in the floorboard of his truck, as she struggled against the force he applied, over the course of multiple acts of sexual assault. Dr. Sabharwal testified that the victim's death was due to a combination of exhaustion from struggling to escape the defendant's restraint in a confined area, and the presence of drugs in her system. Further, due to her exhaustion caused by the defendant's restraint and the victim's

struggle against that restraint, she could not free herself from her confined position, which limited her ability to take in the necessary oxygen her body needed to survive. The victim ultimately became unresponsive and died by asphyxiation.

¶ 76    The defendant's conduct of restraining the victim supported each aggravated sexual assault conviction in that the continued restraint and struggle endangered her life. Thus, the State proved that the defendant's actions of continually restraining the struggling victim in a confined area, while she had drugs in her system, over the course of multiple sexual assaults, was an inseparable part of each offense. The continuing acts of restraint committed by the defendant led up to, occurred before, during, and after each act of sexual assault. Unlike pregnancy or death, endangering one's life may occur more than once over a series of events, as it did here.

¶ 77    Even if we were to construe the defendant's actions as one act of restraint that endangered the defendant's life, however, we would still affirm under the *King* doctrine. To require the State to prove that the defendant endangered the victim's life in different ways during each separate act of sexual penetration in order to be found guilty of multiple counts of aggravated criminal sexual assault is unsupported by case law. See *Segara*, 126 Ill. 2d at 77; *People v. Anderson*, 325 Ill. App. 3d 624, 638 (2001); and *Rodriguez*, 169 Ill. 2d at 188-89 (upholding the defendant's multiple convictions of aggravated sexual assault based on the same aggravating factor).

¶ 78    We conclude that the one-act, one-crime doctrine was not violated here, where the evidence demonstrated that the defendant's actions endangered the victim's life, where each act stacked on the next and contributed to the increasing danger, culminating in the victim's death. The defendant's actions endangered the victim's life during each act, to an increasing degree over the time it took to accomplish each act. Thus, the defendant's actions endangered the victim's life during each act of sexual penetration. As such, the defendant's convictions are affirmed.

29

¶ 79                    3. *Defendant's Unlawful Restraint Conviction*

¶ 80    Finally, the defendant argues that this court should vacate his conviction for unlawful restraint where it stemmed from the same act as his aggravated criminal sexual assault conviction. The State argues that the offenses arise from a series of incidental or closely related acts and thus urges us to engage in the abstract elements test.

¶ 81    While the defendant argues the one-act, one-crime rule applied generally to his case in the lower court, he did not specifically argue before the trial court that his unlawful restraint conviction and his aggravated criminal sexual assault conviction relied on the same act of restraint. As a violation of the one-act, one-crime doctrine is reviewable under the second prong of the plain-error doctrine as "an obvious error so serious that it challenges the integrity of the judicial process" (*People v. Coats*, 2018 IL 121926, ¶ 10), we will consider this issue.

¶ 82    In *King*, our supreme court explained that "[p]rejudice results to the defendant *** where more than one offense is carved from the same physical act." *King*, 66 Ill. 2d at 566. Decisions following *King* summarized the one-act, one-crime doctrine as involving a two-step analysis. *Rodriguez*, 169 Ill. 2d at 186. First, the court must determine whether the defendant's conduct involved multiple acts or a single act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). Multiple convictions are improper if they are based on precisely the same physical act. *Id.* If the conduct involved multiple acts, the court must determine whether any of the offenses are lesser-included offenses. *Id.* If so, multiple convictions are improper. *Id.*

¶ 83    Unlawful restraint is not necessarily a lesser-included offense of criminal sexual assault and is punishable as a separate crime if the restraint is independent of the other offenses and arose out of separate acts. *People v. Hood*, 2022 IL App (4th) 200260, ¶ 136. For example, in *People v. Alvarado*, 235 Ill. App. 3d 116, 117 (1992), the defendant drove the victim to a secluded area,

30

sexually assaulted her, then drove to his grandfather's house. *Id.* Upon arrival, the victim jumped out of the car and ran to the front door, but the defendant grabbed her and physically prevented her from entering the house. *Id.* The Third District held that convictions for both criminal sexual assault and unlawful restraint could stand because "the convictions were based on separate, independent acts which were not closely related." *Id.*

¶ 84　　Likewise, in *Hood*, the defendant performed multiple acts of physical force over the course of at least three hours while committing three sexual assaults. *Hood*, 2022 IL App (4th) 200260, ¶ 137. The court found that after the acts of sexual penetration had concluded, the defendant prevented the victim from leaving his house, instead ordering her to shower. *Id.* The additional act of detention "was not necessary to effectuate the sexual assault," and was instead a separate detention for the purposes of destroying evidence of the sexual assault. *Id.* The defendant in *Hood* also, before allowing the victim to leave his porch, made the victim kiss him so that her departure would appear normal on neighbors' cameras. *Id.* ¶ 138. The Fourth District held that this was another separate and independent act of detention that was not necessary to effectuate the sexual assaults but was intended to conceal them. *Id.*

¶ 85　　In contrast, in *People v. Daniel*, 2014 IL App (1st) 121171, the defendant was convicted of aggravated unlawful restraint and armed robbery. In finding a one-act, one-crime rule violation, the court analyzed the armed robbery as a single course of conduct in which the restraint was "inherent" in the robbery and not independent of it. *Id.* ¶¶ 54-55. There, the defendant took property from the victim during three closely related interactions, each by the use or threat of force. *Id.* ¶ 54. The defendant first threatened the imminent use of force by displaying a gun, removed money from the store's cash register, and again threatened to shoot the victim if he moved. *Id.* The defendant removed more money from the register, kicked and beat the victim, and took his wallet.

*Id.* The First District found that the restraint effectuated by the defendant was inherent in the armed robbery, not independent of it, and vacated the defendant's aggravated unlawful restraint conviction. *Id.* ¶ 55.

¶ 86    We note that the State argues that the defendant did not specifically identify which charge of aggravated criminal sexual assault or sexual assault he believes relies on the same act. In the defendant's opening brief, however, he specifically points to State's exhibit 41C, a 50-second video which was used during the defendant's trial to show the jury evidence of both one act of aggravated criminal sexual assault and the charge of unlawful restraint. The trial court made clear during sentencing that what the court and parties referred to as act one was charged in counts II and IV of the information. During its closing arguments, after the State played the video contained in State's exhibit 41C for the jury, the State said:

> "That video shows *act one* of Aggravated Criminal Sexual Assault. But it also shows one of the other things this defendant is charged with, and that's the act of unlawful restraint. *** In that video you saw his leg over her head and his other leg over her body while she struggled and fought." (Emphasis added.)

As the State focuses on the abstract elements approach in its argument and discerned that the defendant failed to point to a specific charge, the State fails to address the separate acts issue.

¶ 87    The State's charging document alleged that the defendant committed aggravated criminal sexual assault where he committed an act of sexual penetration upon the victim by inserting his fingers into the sex organ of the victim by use of force, and that he acted in a manner that threatened or endangered the life of the victim. In regard to the unlawful restraint charge, the information alleged that the defendant knowingly and without legal authority detained the victim where he restrained the victim with his legs on the floorboard of his truck.

32

¶ 88 The State specifically limited the act to a single 50-second video clip which clearly shows only one act of restraint. In State's exhibit 41C, the defendant is depicted restraining the victim with his legs on the floorboard of his truck. The act of doing so was the act of force necessary to effectuate the sexual assault and was also the restraint relied upon for the unlawful restraint charge. There was no separate act of restraint contained in State's exhibit 41C; therefore, both convictions were carved from the same physical act. Therefore, we vacate the defendant's unlawful restraint conviction and direct the trial court to enter a revised mittimus striking the vacated conviction. See *People v. Kline*, 2024 IL App (1st) 221595, ¶ 91 (a reviewing court may correct the mittimus at any time); *People v. Stoud*, 392 Ill. App. 3d 776, 808 (2009) (reviewing court may correct mittimus to reflect the findings of the reviewing court).

¶ 89                    C. Clerical Error in the Mittimus

¶ 90 Defendant's final argument on appeal is that remand to the trial court is necessary pursuant to Illinois Supreme Court Rule 472 (eff. Feb. 1, 2024), to correct a clerical error in the mittimus. The defendant argues, and the State concedes, that the sentencing order in this matter incorrectly lists the offense for count XIII as aggravated criminal sexual assault when the trial court found that the criminal sexual assault charged in counts XIII and XIV merged and the defendant was sentenced to 10 years on the merged criminal sexual assault count, not the 20-year sentence on aggravated criminal sexual assault the sentencing order indicates. Pursuant to Rule 472(a)(4), in criminal cases, the circuit court retains jurisdiction to correct clerical errors in the written sentencing order resulting in a discrepancy between the record and the actual judgment of the court at any time following judgment. Ill. S. Ct. R. 472(a), (a)(4) (eff. Feb. 1, 2024). Rule 472(e) provides that,

"[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court *shall* remand to the circuit court to allow the party to file a motion pursuant to this rule." (Emphasis added.) Ill. S. Ct. R. 472(e) (eff. Feb. 1, 2024).

¶ 91 The defendant's case falls squarely under the rule; thus, we remand the issue of clerical errors contained in the sentencing order to the trial court to allow the defendant to file a motion in that court, if he chooses to do so.

¶ 92                                    III. CONCLUSION

¶ 93 For the foregoing reasons, we vacate the defendant's unlawful restraint conviction and direct the trial court to enter a revised mittimus. We otherwise affirm the defendant's convictions and sentence. Pursuant to Rule 472, however, we remand the issue of clerical error in the mittimus to the trial court to allow the defendant to file a motion in that court, if he chooses to do so.

¶ 94 Affirmed in part, vacated in part, and remanded with directions.