2025 IL App (1st) 251226-U

SECOND DIVISION
December 23, 2025

No. 1-25-1226B

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 21CR566 |
| | ) | |
| KENNETH OLUGBODE, | ) | Honorable |
| | ) | Shelley Sutker-Dermer, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order granting the State's petition for pretrial detention is affirmed where defendant waived any challenge to the trial court's ultimate detention decision, and his remaining appellate challenges were not meritorious.

¶ 2    Defendant, Kenneth Olugbode, appeals the trial court's order granting the State's verified petition for pretrial detention pursuant to section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2024)).

¶ 3     The record on appeal shows that defendant was arrested on December 8, 2020. On December 10, 2020, the trial court held a hearing, first noting that defendant was not present. A police officer testified that defendant was currently in the hospital being treated for gunshot wounds. The court found defendant physically incapacitated.

¶ 4     The State asserted that defendant had been charged with three counts of attempted first degree murder and one count of aggravated unlawful restraint, and that it had "file[d] a Discretionary No Bail Petition." The court responded that it would not yet rule on the State's petition, because defendant was not present and he "ha[d] a right to be here." The court, however, allowed the Assistant State's Attorney's (ASA) request to be sworn, and to testify to a proffer on the offense.

¶ 5     The facts underlying the charge will be more fully set out below in this court's recitation of the facts from the relevant hearing at issue in this appeal. In short, the ASA explained that, after accusing a former romantic partner, Niya Soria, of stealing money from him, defendant threatened her with a firearm, and forced her into his vehicle to go look for the money. Soria was eventually able to escape and notify police. The next day, Soria told the police that defendant was trying to meet with her again, and she informed them of his whereabouts. When the police pulled over the vehicle defendant was driving, defendant exited the vehicle, "immediately raised up a firearm," pointed it in the direction of three police officers, and fired two gunshots. The police officers returned fire. The shooting was captured on the officers' body-worn cameras. No officers were struck by gunfire. Defendant, however, suffered multiple gunshot wounds. He was transferred to the hospital, and was "in serious but stable condition" at the time of the hearing.

¶ 6     The ASA then explained that defendant's criminal background included "a prior conviction for possession of a controlled substance with intent" and unlawful use of a weapon (UUW) by a

felon from 2016, for which he received "[s]ix years in the Illinois Department of Corrections." Defendant also had a "felony Class 4 possession of controlled substance" conviction from 2014, for which he received 30 months' probation. Defendant violated that probation and was sentenced to one year imprisonment. Defendant also had "a UUW felon conviction" from 2012, for which he received three years imprisonment, and an "aggravated battery, great bodily harm conviction" from 2008, for which he received 3 ½ years imprisonment. Defendant also had two prior misdemeanors for a "2015 criminal trespass to land" and a "2014 domestic battery." Defendant had "three prior failures to appear" as well as an "outstanding warrant from Louisiana, *** for a charge of attempt[ed] second-degree murder" and other counts.

¶ 7    Defense counsel "reserve[d] mitigation at this time," because counsel had not yet had the opportunity to meet with defendant.

¶ 8    Following the State's proffer, the court noted that the allegations against defendant were "of an extremely violent nature," and that he had a significant criminal background. The court explained, "By several layers of law, he is not allowed to possess any type of firearm let alone fire it." The court, however, stated that it was "going to enter and continue the State's petition for no bail because he has a right to be here and present for that. However, for now, based on the fact that I don't have a mitigation picture from [defense] Counsel, this is going to be a no bail situation until his next court date."

¶ 9    The court also noted that defendant had a "fugitive extradition warrant." A Chicago Police Department Extradition Officer stated that defendant was "wanted out of Iberia Parish, Louisiana, for attempted second-degree murder, and they're requesting a no bond hold." The court found "probable cause as to the fugitive warrant," and ordered defendant to be held "no bail."

¶ 10    Thereafter, on January 5, 2021, defendant was charged by indictment with 24 counts of

3

attempted murder, and additional charges including aggravated discharge of a firearm, armed habitual criminal, and aggravated UUW. Defendant's arraignment occurred on January 26, 2021.

¶ 11    The record indicates that defendant was initially represented by counsel from the Public Defender's Office. During the time defendant was represented by counsel, defendant did not request, and the court did not conduct, another hearing on the State's petition. At some point in 2023, the court allowed defendant's request to represent himself *pro se*.

¶ 12    In a hearing on January 24, 2025, defendant, *pro se*, requested for the first time that the court review his pretrial detention, arguing that he was entitled to pretrial release under Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act (Act). Defendant argued that "under the SAFE-T Act the State has *** 48 hours to serve a verified petition." The court responded that defendant's case "predate[d] the SAFE-T Act." Defendant responded, "Okay," then stated that he was making a "verbal motion for reconsideration of pretrial [detention]." The court asked defendant if he "want[ed] a review of [his] detention" and defendant responded, "Yes." The court confirmed, "You're asking to switch to the new law and for the State to file an actual detention *** petition?" Defendant responded, "Yes." The court instructed defendant to file a written motion, then asked the ASA if the State would file a "review of his detention." The State agreed.

¶ 13    That same day, on January 24, 2025, the State filed a verified petition for a pretrial detention hearing, alleging that (1) defendant committed the detainable offense of attempted murder of a police officer; (2) defendant posed a real and present threat because he fired a firearm in the direction of several police officers; and (3) defendant's dangerousness could not be mitigated by any less restrictive conditions.

¶ 14    On March 5, 2025, defendant filed a motion "for immediate pre-trial release," alleging that he had been detained for "50 months *** [without] the opportunity for pretrial release in direct conflict with Constitutional Due Process," that "40 calendar days ha[d] elapsed" since he "asserted his constitutional right to pretrial release" on January 24, 2025, and that he had not yet been "tendered copies of the State's 'supposed' verified petition." For those reasons, defendant argued that he "should be released, albeit with conditions until less severe measures are deemed permissible under the Safe-T Act."

¶ 15    Thereafter, on March 28, 2025, defendant filed a petition to "compel" a pretrial detention hearing. Defendant asked the court to require Soria and the police officers to testify, arguing that without such testimony, he would be "deprived [of] the opportunity to *** show exactly how [defendant] was lured into [the] incident in question."

¶ 16    In court on that same date, the State explained that defendant had not been present in court for a hearing on the initial discretionary no bail petition. The State asserted that it believed that the remedy was to "have the hearing." Defendant responded, "I object to that, your Honor. The solution would be to immediate[ly] release me." The court disagreed, noting that defendant had previously been represented by counsel, and "no one asked for a detention review until *** [defendant] did" a few months before. The court concluded that the "State [wa]s correct. The remedy is to have a hearing which I am going to do right now." The court then proceeded to conduct a pretrial detention hearing.

¶ 17    The State proffered that on December 6, 2020, defendant and the victim, Soria, were driving in defendant's vehicle. Defendant and Soria used to date, and "continued to be friends after they dated."

¶ 18    The next day, on December 7, 2020, defendant appeared at the place where Soria was staying and accused Soria of stealing money from him the previous day. Defendant pulled out a gun and waved it around demanding that she return his money. Defendant then ordered Soria to go with him to his home to look for the missing money. Soria got in the car with defendant but became increasingly afraid as he drove. At one point, Soria attempted to exit the car when it was stopped. Defendant grabbed her and forced her back in the car. At defendant's home, defendant "did not have the gun out, but he still had it with him as he was yelling and demanding that she continue to look for his money."

¶ 19    When defendant went into another room, Soria left the apartment and called the police. As Soria stood outside of that home on the phone with the police, she saw defendant drive away from the building.

¶ 20    When the police arrived, they spoke with Soria on the street. While they were talking, police officers saw Soria receive a message from defendant containing a video of Soria's dog inside defendant's car. In the video, defendant threatened to kill the dog or put him in the trunk if she did not bring defendant's money back.

¶ 21    Thereafter, the police stayed in touch with Soria, as she continued to communicate with defendant. Soria exchanged text messages with defendant that night and into the next morning. Soria wanted to get her dog back and she offered to give defendant "whatever kind of money he wanted."

¶ 22    The next day, on December 8, 2020, Soria contacted one of the officers and told the officer that she and defendant were attempting to meet to exchange money for her dog. Soria informed the officer of the location where defendant told her to meet him, so that officers could be present for the exchange.

¶ 23    While Soria and the officers were on their way to the meeting location, Soria continued to communicate with the police. The police officers were in unmarked vehicles in plainclothes, wearing vests with visible police insignia.

¶ 24    At one point, Soria informed the officers that defendant's vehicle was immediately behind their vehicle. The police allowed defendant's vehicle to pass them in the area of Clark and Devon, then activated their emergency equipment. Defendant continued traveling at a low rate of speed, and disobeyed traffic signals.

¶ 25    When the vehicles were in the area of 6967 North Ravenswood in Chicago, one police vehicle stopped in front of defendant's vehicle to block it, while another police vehicle stopped behind him. One officer exited and approached defendant's vehicle while the other officers shouted at defendant to show his hands.

¶ 26    Defendant exited his vehicle, stood behind his open door, and raised a firearm in his right hand. Defendant pointed the firearm in the direction of Officers Voe, Chester and Zaccagnino, and fired two shots. No officers were struck by the gunfire.

¶ 27    The three officers returned fire, with one officer firing a single shot, the other officer firing seven shots, and the third firing 11 shots. Defendant's vehicle, which had not been placed in park, continued to roll forward and struck the squad car.

¶ 28    At that point, defendant had multiple gunshot wounds to his shoulders, right hip and right hand, and was lying on the ground. Approximately six feet from defendant, officers recovered a semiautomatic firearm, which was clearly visible on their body-worn camera footage. The firearm was secured and remained untouched until evidence technicians could recover it. The officers approached defendant and immediately began providing medical treatment until personnel from the fire department arrived and rendered aid to defendant.

¶ 29    The State then set forth defendant's criminal background consistent with its December 10, 2020, proffer.

¶ 30    Regarding defendant's warrant out of Louisiana, the ASA asserted that he had contacted officers at the New Iberia, Louisiana Police Department the morning of the hearing, who indicated that the warrant was still outstanding, and it was "fully extraditable." The ASA noted that the warrant was accompanied by an affidavit, which provided a proffer of the offense. The ASA explained to the court that on October 25, 2020, at approximately 3:30 p.m. officers of the New Iberia Police Department responded to a home invasion call. The male and female residents of the home told officers that three men posed as delivery drivers and forced their way into the home after the victims opened the door. One of the men, who was later identified as defendant, possessed a handgun. The men "twist tied and duct taped" the residents, and defendant struck the male victim in the head and face. The male victim was "severely beaten" and "at some point [defendant] stated he was going to kill the male victim but one of the other suspects stopped him." The men took equipment from the residents that was used in their photography and videography business, valued approximately $30-35,000.

¶ 31    The victims had security cameras in their home which recorded the offense. An officer later got the video footage, "broke it down into still shots," and showed those photos to the male victim. The male victim viewed the still shots of the person who beat him with the gun, and "immediately yelled out" that it was defendant. Although defendant was wearing a "Covid 19 mask," on the lower part of his face, the man recognized defendant, stating that he had the same "eyewear and facial figure." The male victim explained that he had recently hired defendant to work with his business, that the work defendant was scheduled to do had not materialized, and that defendant "might have been angry about the deal falling through." Defendant had also shot a video

8

of the studio and posted pictures of the equipment that was stolen on his Instagram page. A sergeant viewed defendant's Facebook and Instagram pages, and observed that defendant was wearing the same prescribed eyewear as the suspect was wearing at the crime scene.

¶ 32   Based on the facts of the instant case, as well as defendant's criminal background and the outstanding warrant, the State argued that the evidence showed that defendant posed a real and present threat to the safety of any person or persons or the community. The State asserted that defendant threatened Soria with a firearm, and took and ransomed her dog. Then later, when the police became involved, defendant shot at the officers after they stopped his vehicle. The State also argued that the evidence, which included videos of the offense, showed that defendant was "the person who shot first at the police, and the police shot back in defense of their own person."

¶ 33   The State further stated that defendant's significant criminal background showed that defendant "will not abide by rules of a Court" or "the law," and that he continued to carry a firearm despite being a convicted felon.

¶ 34   The State also argued that no condition or combination of conditions could mitigate this risk, because even if defendant was placed on electronic monitoring, he would have two days of movement, and there would be "nothing preventing this defendant from possessing a firearm. He has shown that he will not abide by the law, which tells him he cannot have a firearm, and he continues to possess a firearm." The State asserted that defendant "fired a weapon at the police which shows a complete disregard for the laws *** that he needs to abide by."

¶ 35   In response, defendant argued that he had never been to the State of Louisiana, and he objected to the court considering that offense. Defendant asserted that the body worn camera footage did not contain audio and that it could be "tainted." In determining his dangerousness, defendant asked the court to consider that one of his convictions related to an incident from when

he was 16 years old and in high school. Defendant then stated that he wanted to call witnesses to rebut the State's allegation that he could have access to firearms if released.

¶ 36    Defendant first called Shawn Mulcahy, a news editor for the Chicago Reader, who had previously worked at a prison reform organization. Mulcahy testified that he had known defendant for two years and met him when Mulcahy was working on a story about conditions at the Cook County Jail. Mulcahy testified that he would give defendant a recommendation for a job and knew others who would do the same. He also testified that defendant was a part of a program that helped incarcerated individuals write memoirs, and that defendant wanted to continue with a writing career and work in the community.

¶ 37    Defendant next called his mother, Belinda Armstrong, who testified that the apartment where defendant was alleged to have brought Soria belonged to her. Armstrong testified that defendant did not live there in 2020, and that he did not have a key to the apartment. Armstrong further testified that if she had seen defendant with a gun, she would have called the police herself. Armstrong asserted that defendant usually had his daughter with him when visiting her apartment, and that defendant would be the primary person driving his daughter to school if he were to be released. Armstrong agreed that she would allow defendant to be placed on "house arrest" at her apartment.

¶ 38    Defendant then told the court that he wanted to testify, and he needed standby counsel to be able to do so. The circuit court explained that defendant had chosen to represent himself and he could tell the court what he wanted the court to know. Defendant then argued that he did not "secretly detain" Soria because he did not have a key to his mother's apartment. Defendant denied that he was on the way to "exchange *** a dog or money" when he was pulled over by police. He acknowledged that he was carrying a firearm at that time, but he alleged that he found the firearm

in a park earlier that day and intended to "turn it in for money [in] Evanston." Defendant alleged that he stopped his vehicle when the police pulled him over, and then "[t]hings moved so fast." Defendant stated that he "didn't plan to kill anyone or shoot anyone. That wasn't what I wanted to do, and *** I was in a panic and lot of things going through my mind that I will -- I plan if it goes to trial to prove." Defendant also alleged that he is "not the same person" anymore, and the "dangerousness factor" had been "mitigated through [his] treatment." Regarding his criminal background, defendant stated that "a lot of *** the cases are older. I have grown. Four years is a long time to work on your inner self, so I just want the Court to consider that."

¶ 39    In ruling, the court found the proof was evident and the presumption great that defendant committed aggravated kidnapping and attempted murder. The court also found that the facts in this case "certainly" showed that defendant posed a real and present safety threat, and that no condition or combination of conditions could mitigate that threat. The court explained that defendant had multiple gun offenses in his background, and despite those convictions, defendant continued to carry a gun during the kidnapping of Soria and the later police shooting.

¶ 40    On April 29, 2025, defendant filed a *pro se* motion for relief, which listed various cases without discussion or argument. Thereafter, on May 9, 2025, defendant provided a "Memorandum" to "expound on his motion for relief," followed by an "Addendum" to that memorandum.

¶ 41    Defendant objected to the timeliness with which he received the State's verified petition, and argued that he had not received a bond hearing. Defendant argued that his "presumption of innocence" cannot be "properly weighed against the State's presumption of dangerousness, if factors like provocation, compulsion, etc., are not considered by the trial court." Defendant also alleged that the trial court denied him the right to testify, did not consider his mitigation, and was

11

biased against him.

¶ 42    The trial court conducted a hearing on defendant's motion for relief on May 9, 2025. At the hearing, defendant argued that the "extraordinary circumstance[s]" of his case warranted the "dismissal of all charges due to the egregious violation of state and constitutional law." Defendant asserted that he had been detained for more than four years without an "adversar[ial] hearing to determine pretrial conditions." Defendant acknowledged that a hearing took place on March 28, 2025, but stated that it was not "an adversarial process." Defendant contended that he was not able to be "cross-examined" like if he had "actual standby counsel" and instead, he had to make a proffer. Defendant contended that the court had not considered defendant's proffer, and that it had refused to consider things that the court should have considered under the statute, like his "tax returns."

¶ 43    The State argued that the March 28, 2025, hearing was adversarial, where defendant had been permitted to present extensive argument and witness testimony. The State explained:

> "The things that the defendant wanted to present, he was able to present. He presented witnesses. He presented his mother as a witness. He presented an individual who works for the [Chicago] Reader as a witness. They talked all about the defendant, his character, and different aspects. He also had his mother talk about how he would never be allowed to have a gun in her house, which relates exactly to one of the charges."

¶ 44    The State argued that defendant "opted into the new system," and he was given notice that hearing would be conducted under the new statute, which required the court to find that "the proof was evident or presumption great that defendant committed an eligible offense," that he "posed a real and present threat to the safety of any person or persons in the community" and that "no

condition or combination or conditions *** could mitigate the risk." The State asserted that the court had considered those elements in determining that defendant should be detained. Defendant, however, was "rais[ing] *** no issue as to any one of those prongs," nor did he "address any issue regarding the Court's findings."

¶ 45    The State explained that the original bond hearing

> "was held in absentia because [defendant] was in the hospital. The judge detained him on a discretionary no bail petition pending his presence to have an in person bond hearing and go through all the elements under the old system of a no bail discretionary petition. The case was continued after that. And the defendant is correct, no one ever had a hearing on that petition while he was in person. *** [But the judge at the initial hearing] went through the elements without the defendant present and had him held based on that until such time [as] he could have a hearing and be present."

¶ 46    The State noted that defendant had been represented by an attorney from the Public Defender's Office prior to his request "to go *pro se*," and no request had been made to have a bond hearing. However, even if defendant had been denied a bond hearing, defendant's request to have the charges against him dismissed was not an available remedy. Rather, "the remedy if he didn't have a bond hearing is to have a bond hearing," and defendant "received that hearing" on March 28, 2025.

¶ 47    Finally, the State asserted :

> "And Judge, the defendant indicated that he did not receive a copy of the verified petition that was filed on January 24, 2025, and I'd like to speak to that. The reason why he could not receive a copy of that is because the jail has very strict rules. ***

13

[T]he jail made a safety determination that no longer could paper pass from the courtroom to a defendant going back into custody from the State's Attorney, from a defense attorney, or anyone else. It had to go directly through the jail, so we had to make arrangements for that. So on the date that the defendant requested a hearing, I filed a petition. *** I filed it on January 24th, 2025, but I could not hand it to him that day. He did have an opportunity to sit down with me on the next court date, which was 2-18-2025, *** [and] he was able to view all the paperwork at that time. *** I had everything that we needed for the hearing. I showed it to him in the lockup and allowed him to look at it.

***

So there were reasons why the defendant did not actually receive [the petition] on January 24th when it was filed. *** It may go without saying, but in these particular circumstances, Judge, there was a reason, and I believe it was a reasonable reason *** [for] him not obtaining that right away."

¶ 48    In reply, defendant stated that the supreme court had found that "any petition filed while a defendant is not in person is ruled absurd." Defendant also contended that the State was required to file its petition to detain him under the new law at his first court date after the law went into effect, and "since the State did not follow procedural requirement, *** they were deprived of the opportunity to file a petition" and the petition must be "vacated."

¶ 49    In ruling, the court stated that it was "denying [defendant's] motion for relief." The court stated that defendant was "correct," that he "did not have a hearing in person between 2020 and [his] request when [he] became *pro se.*" However, "at that point, once you requested one, I believe that the statute was followed." The court explained that "once [defendant] opted" in to the new

14

system, the court was required to, and did, make the three findings required under the Act.

¶ 50    Regarding the timeliness of the State's petition, the court explained:

> "Your position, I understand, is that they were late. [The verified petition] wasn't
> timely. *** [T]here is no question that there are logistical issues with handing you
> the piece of paper in the courtroom. [The] State concedes that. I observed that. The
> sheriff's department *** would not let you take the paper after a supervisor has
> been called. *** However, you were aware of what the petition said. *** And we
> did, in fact, have a full hearing."

¶ 51    Defendant filed a notice of appeal from that order on June 25, 2025, and the State Appellate
Defender was appointed to represent him on appeal.

¶ 52    In this court, defendant challenges the trial court's May 9, 2025, order denying defendant's
motion for relief from its detention decision.

¶ 53    Pretrial release is governed by article 110 of the Code of Criminal Procedure of 1963
(Code), as amended by the Act, which "abolish[ed] traditional monetary bail in favor of pretrial
release on personal recognizance or with conditions of release." *People v. Hongo*, 2024 IL App
(1st) 232482, ¶ 20. "Section 110-6.1(e) of the Code presumes that all defendants are eligible for
pretrial release and places the burden of justifying pretrial detention by clear and convincing
evidence on the State." *People v. Stock*, 2023 IL (1st) 231753, ¶ 11; 725 ILCS 5/110-6.1(e) (West
2024).

¶ 54    For the State to obtain an initial detention order, the Act requires three showings by "clear
and convincing" evidence:

> "For qualifying offenses, upon filing a verified petition requesting denial of pretrial
> release, the State has the burden to prove by clear and convincing evidence (1) that

the proof is evident or the presumption great that a defendant has committed a qualifying offense (725 ILCS 5/110-6.1(e)(1) (West 2022)); (2) that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (725 ILCS 5/110-6.1(a)(1)-(7), (e)(2) (West 2022)) or a likelihood of willful flight to avoid prosecution (725 ILCS 5/110-6.1(a)(8), (e)(3) (West 2022)), and (3) that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or prevent the defendant's willful flight from prosecution (725 ILCS 5/110-6.1(e)(3) (West 2022))." *Hongo*, 2024 IL App (1st) 232482, ¶ 20.

¶ 55 Because there was live testimony presented at defendant's detention hearing, we review the circuit court's ultimate detention decision and any factual findings supporting the decision, under the manifest weight of the evidence standard. *People v. Morgan*, 2025 IL 130626, ¶ 54 ("when live witness testimony is presented at a pretrial detention hearing, the circuit court's ultimate detention decision under section 110-6.1, in addition to any underlying factual findings supporting the decision, will not be disturbed on review unless found to be contrary to the manifest weight of the evidence.").

¶ 56 Defense counsel filed a notice in lieu of a Rule 604(h) memorandum in this court on October 24, 2025. "Issues raised in the motion for relief are before the appellate court regardless of whether the optional memorandum is filed." Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024).

¶ 57 Illinois Supreme Court Rule 604(h)(2) mandates that

"As a prerequisite to appeal, the party taking the appeal shall first present to the trial court a written motion requesting the same relief to be sought on appeal and the grounds for such relief. The trial court shall promptly hear and decide the

motion for relief. Upon appeal, any issue not raised in the motion for relief, other than errors occurring for the first time at the hearing on the motion for relief, shall be deemed waived." Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024).

¶ 58    Paragraph (h)(7) of the rule further dictates that "whether made in the motion for relief alone or as supplemented by the memorandum, the form of the appellant's arguments must contain sufficient detail to enable meaningful appellate review, including the contentions of the appellant and the reasons therefore and citations of the record and any relevant authorities." Ill. S. Ct. R. 604(h)(7).

¶ 59    Initially, we note that the arguments defendant raised in defendant's motion for relief fail to challenge the primary issue before the court on appeal from a detention hearing—namely, whether the proof is evident or the presumption great that defendant committed a qualifying offense, whether defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community, and whether any condition or combination of conditions could mitigate that threat. See *Hongo*, 2024 IL App (1st) 232482, ¶ 20. Because defendant's motion did not assert any arguments regarding the three required elements, those issues are waived under Rule 604(h)(2). See *People v. Drew*, 2024 IL App (5th) 240697, ¶¶ 39-43 (appellate review under Rule 604(h) is limited to the arguments raised in the motion for relief).

¶ 60    Waiver aside, based on the evidence before the court, we would not find the trial court's detention decision to be against the manifest weight of the evidence. The State's proffer established that defendant threatened Soria with a firearm and forced her to accompany him back to an apartment to look for money he claimed she had taken from him. And later, when police attempted to pull him over, defendant exited his vehicle and immediately fired two gunshots in the direction of the police officers. These events were captured on the officers' body worn cameras. These facts

establish that the proof is evident or presumption great that defendant committed the detainable offenses of aggravated kidnapping and attempted murder. Indeed, defendant did not argue at any point that he did not shoot at the officers, instead asserting only that he intended to show at trial that he did not intend "to kill anyone or shoot anyone" and that he only acted "in a panic."

¶ 61    The circumstances of the offenses and defendant's significant criminal history, also support the conclusions that defendant is dangerous, and that no condition or combination of conditions short of detention could mitigate the threat he poses. Defendant's actions in threatening and kidnapping Soria while armed with a firearm, and shooting at police officers who attempted to pull him over, showing a total disregard for human life. Defendant has multiple felony convictions, including offenses involving firearms. And although defendant was prohibited from possessing firearms as a convicted felon, the evidence in this case shows that defendant continued to possess and use firearms in violation of the law. The evidence before the trial court suggests that defendant is a real and present threat, and that he will not comply with court ordered conditions.

¶ 62    We thus turn to the arguments defendant did raise in his motion for relief. As best we understand, defendant contends that he was denied the right to testify, that the court failed to conduct an "adversarial" hearing, and that he was not timely tendered copies of the State's verified petition. Defendant asserts that the remedy for the above violations is the "dismissal of all charges" against him.[1]

---

[1] To the extent that we have not specifically addressed any issues that defendant included in his *pro se* motion for relief, we find that they were not adequately raised to enable meaningful review. See Rule 604(h)(7) (requiring the motion for relief to "contain sufficient detail to enable

¶ 63    First, defendant's contention that he was denied the ability to testify is rebutted by the record. Defendant's claim is not that the court denied him the opportunity to present his version of events and arguments. Rather, defendant claims that his "live testimony was tarnished" by the court's decision to "unjustly den[y] [him] standby counsel," and accordingly, he was "unable to receive proper direct examination."

¶ 64    Although the court denied defendant's request for standby counsel, the circuit court explained that defendant had chosen to represent himself, and that he did not need standby counsel to ask him questions. Instead, defendant could testify in narrative form, providing whatever points he wished to address to the court. Defendant then spoke at length, raising various challenges to the State's proffered evidence and argument as to why the court should find that he was no longer dangerous. In these circumstances, there is no basis for a claim that he was denied the right to testify. *People v. Gibson*, 136 Ill. 2d 362, 383 (1990) ("the right of self-representation does not carry with it a corresponding right to the assistance of a legal adviser; one choosing to represent himself must be prepared to do just that."); *People v. Hood*, 2022 IL App (4th) 200260, ¶ 84 ("A *pro se* defendant does not have a right to standby counsel."); see also *United States v. Hung Thien Ly*, 646 F.3d 1307, 1312 (11th Cir. 2011) ("A *pro se* criminal defendant may testify in narrative form; he does not require an attorney's assistance.").

¶ 65    Defendant also was not denied an "adversarial hearing." To the contrary, the court allowed defendant to present the evidence that he wanted to present, including permitting defendant to call witnesses. Defendant provided lengthy arguments as to what he believed were deficiencies in the

meaningful review, including the contentions of the appellant and the reasons therefore and citations of the record and any relevant authorities.").

State's case against him, and disputing the State's evidence regarding his dangerousness.

¶ 66    We also reject defendant's claim regarding the timeliness of the State tendering him a copy of its verified petition. In defendant's motion for relief, he asserted that, after he "orally asserted his right to pretrial release" on January 24, 2025, he "expected to promptly receive a verified petition, when filed, in order to prepare for an adversarial hearing." Defendant maintains, however, that he only "received [the] verified petition" on March 11, 2025.

¶ 67    The record shows that the State filed its verified petition for pretrial detention the same day as defendant requested that the court review his detention. Although that petition was not immediately tendered to defendant, the court explained that there were "logistical issues" that prevented defendant from receiving a copy on the same date that the verified petition was filed. The State, however, asserted that it had shown defendant all relevant documents at the next court date, on February 18, 2025. And defendant acknowledges that he received a copy of the verified petition on March 11, 2025, well before the March 28, 2025, hearing date. Defendant does not assert that he suffered any prejudice from the State's allegedly late tendering of the petition, and the record shows that defendant was aware of the petition and its allegations, and he was able to meaningfully participate in the detention hearing.

¶ 68    Finally, even if any of defendant's challenges had merit, which we do not find, this court finds no authority to support defendant's contention that the charges against him should be dismissed as a result. *People v. Atchison*, 2019 IL App (3d) 180183, ¶ 13 ("[I]t is well settled that the trial court is authorized to dismiss criminal charges prior to trial only for the reasons set forth in section 114-1 of the Code * * * or where there has been a clear denial of due process which prejudiced defendant." (Internal quotations omitted)); see also *People v. Robinson*, 217 Ill. 2d 43, 60 (2005) (although the court clerk failed to serve the petitioner with a written order dismissing

his postconviction petition within the 10-day period mandated by statute, the petitioner was not entitled to a "remedy because he was not prejudiced by the clerk's error."). In this case, defendant sought reconsideration of his detention, and he "received the hearing [to which] he was entitled." *People v. Watkins-Romaine*, 2025 IL 130618, ¶¶ 37-49 (when a defendant remains in custody prior to the Act's effective date, the defendant may seek a hearing under the Act, and the State is "permitted to respond and request that [the defendant] remain detained.").

¶ 69    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 70    Affirmed.